JONES TRUCK LINES, INC., Debtor–In–Possession, Plaintiff,

v.

ALLIANCE RUBBER COMPANY, Defendant.

No. 93–6087.

United States District Court,
W.D. Arkansas,
Hot Springs Division.

Feb. 17, 1994.

Order Denying Reconsideration
March 30, 1994.

Charles T. Coleman, Kimberly W. Tucker, Wright, Lindsey & Jennings, Little Rock, AR, David G. Sperry, Independence, MO, for Jones Truck Lines, Inc.

Henry C. Kinslow, El Dorado, AR, for Alliance Rubber Co.

## ORDER

HENDREN, District Judge.

NOW on this 15th day of February, 1994, comes on for consideration defendant's Motion for Reconsideration of the Order entered by the Honorable H. Franklin Waters on October 13, 1993. In that Order, the Court denied defendant's Motion for referral of various issues to the Interstate Commerce Commission ("ICC").

In its motion, defendant states that on or about December 3, 1993, the Negotiated Rates Act of 1993 ("NRA") was passed, and that under the language of the Act, the Court is required to refer the issue of whether there was a valid contract involved to the ICC. Plaintiff responds by arguing the NRA is invalid, citing certain language in the NRA and 11 U.S.C. § 541(c)(1). Section 8 of the NRA provides, in pertinent part:

Section 11101 of title 49, United States Code, is amended by adding at the end the following:

"(d) RESOLUTION OF DISPUTES RELATING TO CONTRACT OR COMMON CARRIER CAPACITIES.—If a motor carrier (other than a motor carrier providing transportation of household goods) subject to the jurisdiction of the Commission under subchapter II of chap-

ter 105 of this title has authority to provide transportation as both a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, the Commission shall have jurisdiction to, and shall, resolve the dispute.".

Section 9 of the NRA states:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

■ Plaintiff argues that based upon the language in Section 9 of the NRA, coupled with the language in 11 U.S.C. § 541(c)(1), the Court should find that the NRA is not valid in this case. 11 U.S.C. § 541(c)(1) provides:

Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—

(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title [11 USCS §§ 101 et seq.], or on the appointment of or taking possession by a trustee in a case under this title [11 USCS §§ 101 et seq.] or a custodian before such commencement and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

Defendant refers to the legislative history surrounding Section 9 of the NRA and argues the whole basis for the NRA was that trustees for bankrupt carriers were pressing businesses all across the country for payments on shipments made years before.

The Court has reviewed the legislative history of Section 9 of the NRA as well as the comments of Senators Hollings and Danforth provided to the Court by counsel for defendant and concludes, as argued by defendant, that it shows the NRA was clearly passed in response to claims made by trustees for bankrupt motor carriers.

Senator Hollings stated:

. . . .

As the Commerce Committee has recognized for some time, the undercharge crisis reflects a broad spectrum of efforts by trustees for bankrupt motor carriers to collect from shippers additional payments for shipments which moved and were paid for years ago. I recognize the compelling nature of the unsecured claims of former drivers of now bankrupt trucking companies seeking unpaid wages, the pension funds left with unfunded liabilities, and the demands of other creditors. At the same time, the continually escalating undercharge litigation and collection spiral serves no useful purpose, and makes clear the long overdue need for a legislative solution to this problem. The Senate recognized this mandate for action in passing equitable undercharge resolution legislation in this Congress and the last Congress. Now that the House also has acted, we have an opportunity to consider this measure for final passage in the 103rd Congress.

Senator Danforth stated:

Mr. President, today we may finally bring to an end an expensive nuisance for America's businesses that has resulted from the continued enforcement of outdated laws. Last fall, 60 Minutes ran a story entitled "You're Kidding." This story involved interviews with small businessmen hit with large freight bills related to shipments for which they had paid years ago. These shippers were asking how this could happen.

The answer requires a review of the law governing motor carriers' movement of freight. The Motor Carrier Act of 1980 substantially deregulated the trucking industry by eliminating most price and entry requirements. One significant regulation

retained was the requirement that trucking companies file with the Interstate Commerce Commission (ICC) all tariffs governing shipments. Since enactment of the 1980 act, however, carriers have frequently negotiated lower rates with shippers but have not filed those rates with the ICC. In 1990, the Supreme Court, in Maislin Industries versus Primary Steel, held that shippers are required to pay the filed rate when the shipper and carrier have privately negotiated a lower rate, regardless of the equities involved. The trustees of bankrupt trucking companies that had negotiated such rates are now suing shippers for the difference. These suits are being brought years after payment for and delivery of the shipments.

Let me use a hypothetical to illustrate the absurdity of this situation. In my example, you bought a discounted airline ticket from Pam[sic] Am several years ago for $300. Subsequently, Pan Am liquidates. Pan Am's bankruptcy trustee notifies you that the nondiscounted price of the ticket you purchased was $600. The trustee says that Pan Am was supposed to file the discounted ticket price, $300, with a government agency, but he failed to do so. Thus, Pan Am's trustee says that you owe the difference between the agreed upon price and nondiscounted fare. The bottom line is that those who are suffering are the ones who made a deal and fulfilled their obligations.

. . . .

This legislation also preserves a shipper's right to pursue an ICC determination of the reasonableness of the rate charged, if a shipper elects not to use the settlement formulas. It also eliminates lawsuits that bankruptcy trustees have brought to collect money from shippers related to code and range tariffs.

. . . .

139 Cong.Rec. S16183–01, S16186.

■ Clearly, in the case now before the Court, there is a dispute as to whether there was a valid contract and whether plaintiff transported the goods in question under its contract carrier authority or common carrier authority. The Court recognizes the appar-

ent conflict between the language of the bankruptcy statute quoted above and the legislative history of the NRA but believes one of the main purposes of NRA was to make an impact on the number of lawsuits brought by trustees in their capacities as representatives of bankrupt estates.

Based upon its review of the respective arguments of the parties and of the legislation itself, the Court believes the NRA to be valid and applicable. Accordingly, pursuant to the language of Section 9 of the NRA, the Court finds it appropriate to refer to the ICC the issues regarding whether there was a valid contract and whether plaintiff transported the goods in question under its contract carrier authority or common carrier authority. The Court also finds it appropriate to refer to the ICC the other issues raised in defendant's original Motion to Refer and in the Conclusion of its Brief in Support thereof.

The Court therefore grants the Motion for Reconsideration and refers the issues discussed above to the ICC.

The Clerk is directed to administratively terminate this case. However, within thirty (30) days after determination by the ICC as to whether the disputed shipments were transported pursuant to plaintiff's contract carrier authority, counsel for the parties may file a motion to reinstate if any further proceedings are necessary herein. If no such motion is filed, this case will be dismissed with prejudice.

IT IS SO ORDERED.

### ORDER ON RECONSIDERATION

NOW on this 30th day of March, 1994, comes on for consideration Plaintiff's Motion for Reconsideration of the Court's Order entered February 17, 1994. In support of its motion, plaintiff has attached a copy of an Order entered by a Bankruptcy Court in North Carolina which was well thought-out and well written. This Court, however, is more persuaded by the decisions of fellow federal district judges in this state, who have entered decisions of referral to the ICC, than by the decision of a Bankruptcy Court sitting in North Carolina which reaches a contrary

result. Moreover, after carefully reviewing and considering the North Carolina Bankruptcy Court's order, this Court finds nothing therein so persuasive or compelling as to warrant this Court's abandonment or change of its previous order.

ACCORDINGLY, after considering the arguments presented in support of plaintiff's motion, the Court hereby denies the Motion for Reconsideration.

IT IS SO ORDERED.