In re AMERICAN FREIGHT
SYSTEM, INC., Debtor.

AMERICAN FREIGHT SYSTEM,
INC., Plaintiff,

v.

INTERSTATE COMMERCE COMMISSION, United States of America, B.F. Goodrich a/k/a Uniroyal Goodrich Tire, Interplastic Company and Higbee Company, Defendants.

Bankruptcy No. 88–41050–11.
Adv. No. 94–7011.

United States Bankruptcy Court,
D. Kansas.

March 30, 1995.

As Corrected April 25, 1995.

Kurt Stohlgren, Kansas City, MO, for debtor/plaintiff.

Virginia Strasser, Washington, DC, for defendant I.C.C.

Brendan Collins, Dept. of Justice, Washington, DC, for defendant U.S.

Scott J. Goldstein, Kansas City, MO, for B.F. Goodrich.

Joseph M. Weiler, Topeka, KS, for defendant Interplastic Co.

Anthony D. Clum, Topeka, KS, for defendant Higbee Co.

Mark A. Dickerson, Pleasant Hill, CA, for Levi, Strauss & Co.

Paul Hoffmann, Kansas City, MO.

## MEMORANDUM OPINION AND ORDER

JULIE A. ROBINSON, Bankruptcy Judge.

This matter comes before the Court pursuant to the motions to dismiss filed by defendants Interstate Commerce Commission ("ICC"), United States of America ("USA") and Interplastic Company ("Interplastic"), seeking dismissal of the instant adversary action filed by debtor American Freight System, Inc. ("AFS"). Levi, Strauss & Company has filed an amicus curiae brief in support of the motions to dismiss.

### JURISDICTION

The Court has jurisdiction over this proceeding. 28 U.S.C. § 1334. This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O).

### PROCEDURAL BACKGROUND

AFS filed a Chapter 11 petition in bankruptcy in 1988. In connection with its bankruptcy case, AFS has filed adversary actions against more than 2000 shippers to collect freight undercharges, which are charges based on the difference between the shipping rate on file with the ICC and the lower rate that AFS actually billed and collected from the shipper.[1]

On December 3, 1993, President Clinton signed the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044, codified at 49 U.S.C. § 10701 et seq. ("NRA"), which

---

1. Some of the adversary actions were not based on so-called undercharges, or were based on intrastate shipments which are not subject to the rates on file with the ICC.

established a comprehensive process for resolving disputes over freight undercharge claims filed by nonoperating motor carriers. In January, 1994, AFS filed the instant adversary proceeding seeking injunctive and declaratory relief, to wit: asking the Court to find that the provisions of the NRA were inapplicable to AFS, or in the alternative, that the NRA is unconstitutional and void.

In an opinion issued on November 17, 1994, the Court determined that AFS was "no longer transporting property" and thus, was a carrier within the purview of the NRA. The parties have now briefed additional issues concerning the applicability of the NRA to AFS, and whether the NRA is constitutional. The matter is ready for decision.

## MOTION TO DISMISS

Defendants ICC, USA and Interplastic, joined by amicus Levi, Strauss & Company, move to dismiss this action for injunctive and declaratory relief, for failure to state a claim pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 12(b)(6) of the Federal Rules of Civil Procedure.

■ To prevail on a Rule 12(b)(6) motion to dismiss for failure to state a claim, the movant must demonstrate beyond a doubt that there is no set of facts in support of plaintiff's theory of recovery that would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Jacobs, Visconsi & Jacobs, Co. v. City of Lawrence, Kansas,* 927 F.2d 1111, 1115 (10th Cir.1991) (citations omitted). All well-pleaded allegations will be accepted as true and will be construed in the light most favorable to the plaintiff. *Williams v. Meese,* 926 F.2d 994, 997 (10th Cir.1991) (citation omitted).

There is no dispute that the matter before the Court is one without genuine or material issues of fact and can be decided on the basis of the pleadings. In fact, AFS asks the Court to treat defendants' motion to dismiss as a motion for summary judgment, and consider not only the pleadings but the stipulation of facts and affidavit previously filed in this adversary proceeding. AFS further prays that the Court grant summary judgment against the moving parties, and declare the NRA unconstitutional and inapplicable, as a matter of law.

■ AFS has not moved for summary judgment; but a court may, sua sponte, enter summary judgment against the moving party. This practice is an "accepted method of expediting litigation" where there are no issues of fact and where the court, in deciding the movant's motion, would necessarily have to determine the same legal issues that would be raised in a summary judgment motion filed on behalf of the other parties.[2] In this case, AFS has filed an action for declaratory and injunctive relief, seeking a determination that the NRA is either unconstitutional or inapplicable to AFS. The defendants have filed a motion to dismiss for failure to state a claim. The Court must necessarily decide whether the NRA is applicable and whether it is unconstitutional.

## APPLICABILITY OF NRA TO CARRIER WHO IS A BANKRUPTCY DEBTOR

The NRA provides that its provisions for resolving claims involving unfiled, negotiated transportation rates, apply when:

(A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection; and

(B) with respect to the claim—

(i) the person was offered a transportation rate by the carrier or freight forwarder other than that legally on file with the Commission for the transportation service;

(ii) the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;

(iii) the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such trans-

---

2. *See Coach Leatherware Co., Inc. v. Ann Taylor, Inc.,* 933 F.2d 162, 167 (2nd Cir.1991); *In re Caravan Refrigerated Cargo, Inc.,* 864 F.2d 388,

393 (5th Cir.1989), *cert. denied, Supreme Beef Processors, Inc. v. Yaquinto,* 497 U.S. 1010, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990).

portation rate or failed to enter into an agreement for contract carriage;

(iv) such transportation rate was billed and collected by the carrier or freight forwarder; and

(v) the carrier or freight forwarder demands additional payment of a higher rate filed in a tariff.

49 U.S.C. § 10701(f)(1).

■ AFS first argues that the NRA does not apply to its pending adversary actions against the shippers, because its actions are not truly actions to collect undercharges, but are actions to collect additional rates that were inadvertently not billed due to clerical errors or AFS's erroneous application of the wrong rate. In other words, AFS contends that its actions are based on the difference between the correct rate and an erroneously applied rate.[3] Yet, on page 7 of its brief filed on February 2, 1995, AFS contends that "AFS currently has on file hundreds of adversary proceedings wherein it is *attempting to collect approximately $9,400,000 in freight undercharges.*" In a footnote, AFS goes on to note that "AFS is also attempting to collect approximately $2,000,000 in original freight charges, in addition to the above referenced undercharges. These original receivables are not subject to the provisions of the NRA." *Id.* at p. 8, n. 2. Thus, AFS's final brief and final word on this issue is a concession that at least some of its adversary actions are actions to collect undercharges. At least to the extent of those actions, the NRA applies. Furthermore, to the extent that AFS can demonstrate that some of the actions are based on it billing and collecting an erroneous rate, if the so-called erroneous rate was negotiated between the shipper and

AFS and if the shipper reasonably relied on the rate, the rate would meet the definition of a "negotiated rate" and trigger the application of the provisions of the NRA. In any case, whether the particular adversary action is an undercharge action is a dispute that the NRA leaves to the ICC for resolution. Section 10701(f)(1) of Title 49, United States Code, provides that disputes concerning the operating status of the carrier are to be resolved by the court in which the claim is filed; but that disputes regarding whether the claim is based on the difference between a negotiated rate and a filed rate, are to be resolved by the Interstate Commerce Commission. Congress specifically delegated to the ICC the question of whether a freight undercharge claim meets the definition of an undercharge claim under 49 U.S.C. § 10701(f)(1)(B).

■ AFS next argues that by its own terms, the NRA is not applicable to bankruptcy cases. The language AFS relies on is found in Section 9 of the NRA which states that:

Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting applicability of title 11, United States Code, relating to bankruptcy, or the Employee Retirement Income Security Act of 1974.

AFS implores the Court to conclude that the plain meaning of this language is that the NRA does not apply to carriers in bankruptcy.[4] That is not what Section 9 says, however. It says that nothing in the NRA limits or otherwise affects the applicability of the Bankruptcy Code. This must mean that the provisions of the Bankruptcy Code continue to apply to debtor motor carriers. Section 9

---

**3.** These errors, AFS contends, were caused by erroneous calculations of discounts, erroneous applications of discounts to shipments that did not qualify for the discount pursuant to the contract of carriage, and erroneous calculations of charges based on the wrong weight, the wrong commodity, or the wrong date of shipment.

**4.** AFS relies on two cases, *In re Bulldog Trucking, Inc.*, 173 B.R. 517 (W.D.N.C.1994), and *In re Americana Expressways, Inc.*, 172 B.R. 99, 101 (Bankr.D.Utah 1994), report and recommendation denied, 177 B.R. 960 (D.Utah 1995). However, the *Bulldog* decision notes that the NRA is

"applicable nonbankruptcy law" because by its own terms it provides in Section *9* that it does not amend Title 11. *Bulldog*, 173 B.R. at 535. With the exception of the decision in *Americana*, which the District Court refused to adopt, virtually every other court considering the issue has held that Section 9 does not render the NRA inapplicable to bankrupt carriers. *See, e.g., Allen v. Spiegel, Inc.*, 169 B.R. 394 (N.D.Ill.1994); *Jones Truck Lines, Inc. v. Alliance Rubber Co.*, 166 B.R. 691 (W.D.Ark.1994); *Jones Truck Lines, Inc. v. Grinnell Corp. Anvil Products Div.*, 167 B.R. 488 (N.D.Ill.1994); *In re Best Refrigerated Express, Inc.*, 170 B.R. 158 (Bankr.D.Neb.1994).

does not say, however, that the provisions of the NRA are not also applicable to debtor motor carriers. Section 9 does not create a conflict between its provisions and the provisions of the Bankruptcy Code. In fact, it says that the NRA doesn't limit or affect the Bankruptcy Code. That does not mean that the two laws cannot be consistently applied to debtor motor carriers. As addressed later in this opinion, there is no conflict among the NRA and various provisions in the Bankruptcy Code, such as 11 U.S.C. §§ 541 and 1142.

A resort to legislative history is unnecessary given the plain meaning of Section 9, but it is clear from the legislative history that Section 9 was meant to clarify that the NRA, as applied to debtor motor carriers, in no way amended or affected the provisions of the Bankruptcy Code.

Congress enacted the NRA in order to modify the filed rate doctrine, as the Supreme Court had invited it to do in *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).[5] To that end, there were two competing bills. H.R. 2121 was referred to the House Public Works Committee, which has jurisdiction over the Interstate Commerce Committee. H.R. 2021 was referred to the Judiciary Committee and the Committee on Education and Labor. H.R. 2021 was referred to the Judiciary Committee because it proposed to amend the Bankruptcy Code, as well as the Employee Retirement Income Security Act. H.R. 2121 did not propose to amend the Bankruptcy Code or ERISA. *See* Hearing Before the Subcommittee on Surface Transportation, June 15, 1993, page IX. Thus, when H.R. 2121 was reported out of committee on November 4, 1993, it contained language clarifying that, unlike H.R. 2021, it was not to be construed as limiting or otherwise affecting application of the Bankruptcy Code or ERISA. This prompted Congressman Brooks, Chair of the House Judiciary Committee, to express concern about the jurisdiction of the courts vis-a-vis the jurisdiction of the ICC over the NRA, and in a letter dated November 10, 1993, he suggested that a referral of H.R. 2121 to the Judiciary Committee might be in order. Congressman Mineta, Chair of the House Public Works Committee, and Congressman Brooks agreed that Brooks' concerns could be resolved by adding language to section 9 that further clarified that the NRA was not limiting or affecting the jurisdiction of the courts of the United States, including the bankruptcy courts. As passed, the NRA, like the Interstate Commerce Act ("ICA"), vests original jurisdiction in the courts of the United States, with referral of some matters to the ICC under the doctrine of primary jurisdiction. *See Reiter v. Cooper,* —— U.S. ——, —— ——, 113 S.Ct. 1213, 1220–21, 122 L.Ed.2d 604 (1993) (noting that the doctrine of primary jurisdiction applies to claims properly cognizable in court that contain some issue within the special competence of an administrative agency).

The final word on this issue, by Congressman Brooks in his statement on the floor on November 15, 1993, the date the NRA was enacted, was as follows:

> The current procedure permits the Federal courts to assure the timely and fair administration and adjudication of bankruptcy cases. Pursuant to changed language of section 9 of the act from the language reported from the Public Works Committee, the Federal courts including the bankruptcy courts, will continue to have jurisdiction to make determinations in connection with motor carrier undercharge claims and related issues where the motor carrier has sought the protection of the Bankruptcy Code. As a result of this provision, in the event of a bankruptcy filing, reference in the act to resolution by, determinations by, and review and approval by the Commission shall be subject to the original jurisdiction of the Federal courts pursuant to 28 U.S.C. 157 and 1334.

139 Cong.Rec. H9603 (daily ed. November 15, 1993) (statement of Rep. Brooks).

The legislative history repeatedly illustrates that it was the intent of the sponsors of H.R. 2121 and the understanding of its

---

5. The legislative history evidences that the *Maislin* decision prompted this legislation. *See* H.R.Rep. No. 359, 103rd Cong., 1st Sess. 8–9 (1993); S.Rep. No. 790, 103rd Cong., 1st Sess. (1993).

opposition, that the NRA was remedial, to address the undercharge litigation crisis which originated, primarily, with nonoperating, bankrupt motor carriers, using the filed rate doctrine to obtain monies to distribute to their creditors. In fact, the opposition to H.R. 2121, led by Congressman Lipinski, voiced concern that cutting recovery of undercharges would harm a particular class of creditors, the former employees of the bankrupt carrier.

It is evident that the NRA was intended to apply to motor carriers in bankruptcy.

### EFFECT OF 11 U.S.C. § 541(c)(1)

AFS contends that the NRA is void and unenforceable because it violates § 541(c)(1) of Title 11, United States Code, which states in pertinent part that:

> ... an interest of the debtor in property becomes property of the estate ... notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
>
> . . . . .
>
> (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B). AFS contends that the NRA, by eliminating or reducing recovery of undercharge claims, effects a forfeiture of its property interest, and that since the NRA is applicable only to carriers that are no longer transporting property, the NRA is applicable nonbankruptcy law that is conditioned on the insolvency or financial condition of the carrier.[6]

■ There are two flaws in AFS's reasoning. First, § 541(c)(1) serves to prohibit agreements or nonbankruptcy laws that prevent a debtor's property from passing into the bankruptcy estate when the debtor files bankruptcy. Section 541 protects AFS's right to assert undercharge claims, which, as causes of action, are property interests that passed into the bankruptcy estate. *See* 4 *Collier on Bankruptcy,* ¶ 541.01 (15th ed. 1994). Nothing in the NRA precludes these claims from becoming a part of the debtor's estate. Nothing in the NRA conflicts with § 541(c)(1).

While the NRA serves to define, limit, and/or diminish the value of undercharge claims, the treatment of these property interests under the provisions of the Bankruptcy Code is in no way affected. Undercharge claims, as a property interest of the debtor, pass into the bankruptcy estate. Undercharge claims, as property of the estate, may be liquidated or otherwise treated in a plan of reorganization.

The NRA does not prevent or affect what property passes into the debtor's bankruptcy estate. The NRA does not deter these undercharge claims from passing into the estate. In fact, the NRA recognizes that these claims are property of the estate. The NRA merely affects the value of these claims, once they have passed into the estate, by giving some shippers amnesty from liability, and by giving other shippers the ability to settle the claims, or defend the claims in the forum of the Interstate Commerce Commission.

■ AFS argues that in the aftermath of the passage of the NRA, these claims have a diminished value. But § 541(c)(1) does not, through its anti-alienation provisions, invalidate a reduction or forfeiture that occurs after the property interest has passed to the bankruptcy estate. Section 541(c) serves to define the universe of property that is included in the estate. However, § 541 neither protects nor was intended to protect the scope or value of a debtor's interest in property. Property rights are defined under applicable nonbankruptcy law, usually state law. *Butner v. United States,* 440 U.S. 48, 54–55, 99 S.Ct. 914, 917–18, 59 L.Ed.2d 136 (1979). In this case, the property right is a

---

6. The NRA is clearly an applicable nonbankruptcy law. The Supreme Court has determined that this phrase includes both state laws and federal nonbankruptcy laws. *Patterson v. Shumate,* 504 U.S. 753, 757–58, 112 S.Ct. 2242, 2246, 119 L.Ed.2d 519 (1992).

claim or cause of action for undercharges. This property interest was created by Congress when it enacted the Interstate Commerce Act, 49 U.S.C. §§ 10101, et seq. Congress has plenary power to regulate interstate commerce. *See California Bankers Ass'n v. Shultz*, 416 U.S. 21, 46, 94 S.Ct. 1494, 1510, 39 L.Ed.2d 812 (1974); U.S. Const. art. I, § 8, cl. 3. Absent a constitutional infirmity, Congress may enact laws that change, redefine or eliminate an interest in property, as long as it acts with due process under the law.

Thus, once a property interest has passed to the estate, it is subject to the same limitations imposed upon the debtor by applicable nonbankruptcy law. *See In re FCX, Inc.*, 853 F.2d 1149, 1153 (4th Cir.1988), *cert. denied, Universal Cooperatives, Inc. v. FCX, Inc.*, 489 U.S. 1011, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989); *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir.1987).

■ Furthermore, to the extent that the NRA conflicts with the Bankruptcy Code, and this Court finds no conflict, it is a cardinal canon of statutory construction that a more recent and specific statute must prevail in a conflict with an older, more general statute. Section 541(c)(1) generally requires that property interests pass into the estate. The NRA specifically focuses on the scope of a particular type of property interest.

■ The second flaw in AFS's reasoning is that the NRA is not conditioned upon the financial condition or insolvency of the carrier. The NRA is applicable to carriers who are no longer transporting property. These carriers may or may not be insolvent. These carriers may or may not be in bankruptcy. Conversely, the NRA is inapplicable to a carrier who is in bankruptcy but who is continuing to transport property.

AFS contends that the legislative history evidences an intent to address a perceived crisis arising from bankruptcy trustees and debtors in possession filing a rash of undercharge actions. To be sure, the legislative history is replete with impassioned statements about bankrupt carriers suing shippers for old bills, long ago negotiated, billed and collected. Yet, it is also clear from the plain language in the NRA, that its application is dependent on the operating status of the carrier, not on the financial condition of the carrier. This distinction is real and rational. A carrier who is no longer operating, whether the carrier is in bankruptcy or not, is not constrained by market forces from filing an undercharge action against its former customers. A carrier who is operating, whether the carrier is in bankruptcy or not, and whether it is in sound financial condition or not, is constrained from suing its customers. It wants to continue to operate. Its continued operation will be severely hampered if it burns bridges with its customer base, by suing shippers for charges in addition to those that the carrier and shipper negotiated for in good faith. It is the carrier who is no longer a player in the marketplace that will suddenly pledge allegiance to the filed rate. An active, operating carrier will be satisfied with collection of its negotiated rates.

■ AFS finds significance in the fact that the NRA applies to motor carriers no longer transporting property **for compensation.** AFS argues that the element of compensation further illustrates that the application of the NRA is premised on a carrier's financial condition. The NRA speaks of carriers no longer transporting property. Motor carrier is defined in the Interstate Commerce Act at 49 U.S.C. § 10102(13) as a motor common carrier and a motor contract carrier, which are defined in 49 U.S.C. § 10102(14) and (15) as providing motor vehicle transportation for compensation. This definition serves to distinguish a public carrier (who transports for compensation) from a private carrier, because private carriers are not subject to the same regulatory restrictions as public carriers. *United States v. Drum*, 368 U.S. 370, 374–76, 82 S.Ct. 408, 410–11, 7 L.Ed.2d 360 (1962). The NRA applies to public motor carriers, not private carriers. Obviously, a private carrier would have no undercharge claims, because it would have no paying customers. The definition of motor carrier as one transporting property for compensation, does nothing to further AFS's argument that the NRA is based on the carrier's financial condition.

*EFFECT OF 11 U.S.C. § 1142*

 AFS further argues that § 1142 of the Bankruptcy Code requires it to pursue the undercharge actions notwithstanding any provision in the law that would prevent or hinder its efforts to collect the undercharges. Section 1142(a) of Title 11, United States Code, provides that

> Notwithstanding any otherwise applicable nonbankruptcy law, rule, or regulation relating to financial condition, the debtor and any entity organized or to be organized for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court.

11 U.S.C. § 1142(a). AFS argues that the NRA qualifies as "otherwise applicable nonbankruptcy law" that cannot defeat the debtors' mandate to effectuate the terms of its plan. This argument.is essentially the same argument the debtor raises concerning the effect of § 541(c)(1). This argument suffers the same deficiencies. The NRA is not a law relating to financial condition; it is a law that is based on operating condition. And, despite the language in § 1142, a provision of a plan cannot prevail over contrary, valid law.

## CONSTITUTIONALITY OF NRA–VOID FOR VAGUENESS

 AFS contends that the NRA is impermissibly vague, thus unconstitutional and void. The void for vagueness doctrine emanates from the due process clause in the Fifth Amendment, which prohibits the deprivation of property without due process of law. Procedural due process is generally satisfied by the legislative process itself, the protections inherent in the process by which the legislature drafts, considers, modifies and approves legislation. Thus, the void for vagueness doctrine stems from the substantive due process ensured by the Fifth Amendment. AFS specifically complains that the election procedures in the NRA, whereby a shipper may elect to settle an undercharge claim by paying a certain percentage of the claim, are vague and incomprehensible. It further complains that § 10701(f)(1)(A), which limits applicability of the NRA to carriers no longer transporting property, is also impermissibly vague. The Court has resolved this issue in its opinion issued on November 17, 1994, which found that the plain meaning of this language in § 10701(f)(1)(A) was evident and that AFS was no longer transporting property and thus was subject to the NRA.

The election provisions are set out in § 10701(f)(2), (3) and (4). A shipper sued for the difference in the filed rate and the negotiated rate, may defend the claim with a showing that the filed rate is unreasonable. Alternatively, the shipper may elect to settle the claim in accordance with the provisions in § 10701(f)(2), (3) or (4). With respect to claims involving shipments weighing 10,000 pounds or less, the shipper may elect to resolve the claim(s) by paying 20 percent of the difference between the applicable and effective tariff rate (the filed rate) and the rate originally billed and paid (the negotiated rate). 49 U.S.C. § 10701(f)(2). For shipments weighing more than 10,000 pounds, the shipper may resolve the claim by paying 15 percent of the difference between the two rates. *Id.* at § 10701(f)(3). And, for claims involving public warehousemen, the warehouseman may resolve the claim by paying 5 percent of the difference between the two rates. *Id.* at 10701(f)(4). The procedures for making an election are set out in exhaustive detail in § 10701(f)(8).

 The election provisions are quite lucid, their meaning plainly ascertainable. These sections of the NRA simply are not vague. Even if the sections could have been drafted more precisely, a statute will not be rendered void merely because Congress could have chosen clearer and more precise language that would equally achieve the objective sought by the statute. *United States v. Powell,* 423 U.S. 87, 94, 96 S.Ct. 316, 320–21, 46 L.Ed.2d 228 (1975) (quoting *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1541–42, 91 L.Ed. 1877 (1947)).

 Moreover, a statute dealing with economic regulation is held to a less strict vagueness test because its subject matter is often more narrow, and because regulated enterprises can resort to an administrative process to clarify the terms of the statute. *See Village of Hoffman Estates v. Flipside,*

*Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982), *reh'g denied*, 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982). Certainly, in the highly regulated field of transportation, the volume of regulations and reported decisions by the ICC effectively serve to clarify and aid comprehension of the legislation where the statute is not sufficiently illustrative.

## CONSTITUTIONALITY–TAKING CLAUSE AND IMPAIRMENT OF CONTRACTS

 AFS contends that the NRA impairs the shippers' obligations under their contracts with AFS, thereby violating the impairment of contracts clause under Article I, section 10, of the U.S. Constitution, which prohibits states from passing any law that impairs the obligations under a contract. U.S. Const. art. I, § 10, cl. 1. This clause applies to legislation passed by the states, not federal legislation. *Peick v. Pension Benefit Guar. Corp.*, 724 F.2d 1247, 1263 (7th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984). There is no comparable clause that is applicable to action by the federal government.

 The Taking Clause of the Fifth Amendment applies to federal legislation and prohibits taking private property "for public use, without just compensation." U.S. Const. amend. V. AFS contends that the NRA takes property, an undercharge claim, without just compensation.

 The protection afforded by the Fifth Amendment applies to vested property rights. *See Taxpayers for the Animas–La Plata Referendum v. Animas–La Plata Water Conservancy Dist.*, 739 F.2d 1472, 1477 (10th Cir.1984). The creditors argue that AFS's cause of action for undercharges is not a vested property right until it has been reduced to a final judgment.

The court recognized this distinction in *Lewis v. Squareshooter Candy Co.*, 176 B.R. 54, 57 (D.Kan.1994), in holding that undercharge claims are not a protected property interest under the Fifth Amendment. A cause of action is inchoate, and is contingent as well as unenforceable until it is reduced to judgment. As the court explained in *In re Consolidated United States Atmospheric Testing Litigation*, 820 F.2d 982, 989 (9th Cir.1987), *cert. denied, Konizeski v. Livermore Labs*, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988):

> A cause of action does not afford the holder the traditional bundle of rights associated with the ownership of property [citation omitted]. Instead, it represents a right to assert a claim for compensation or some other form of judicial relief. Its value is contingent on successful prosecution to judgment. Thus, to the extent it is entitled to due process protection, that protection focuses on assuring access to fair procedures for its prosecution.

*See also Hammond v. United States*, 786 F.2d 8 (1st Cir.1986); *Eddings v. Volkswagenwerk, A.G.*, 835 F.2d 1369 (11th Cir. 1988), *cert. denied, Griffin v. Ford Motor Co.*, 488 U.S. 822, 109 S.Ct. 68, 102 L.Ed.2d 44 (1988).

In *Arbour v. Jenkins*, 903 F.2d 416, 420 (6th Cir.1990), the court upheld retroactive application of the Westfall Act, which became the exclusive remedy for those injured by tortious acts of federal employees acting within the scope of employment. The court found no unconstitutional taking of pending causes of actions, stating that "... a legal claim affords no definite or enforceable property right until reduced to final judgment." *Id.* (citing *Sowell v. American Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir.1989)).

AFS relies on *Coombes v. Getz*, 285 U.S. 434, 52 S.Ct. 435, 76 L.Ed. 866 (1932); *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508, 43 S.Ct. 437, 437–38, 67 L.Ed. 773 (1923) (finding that assignee's rights under steel production contract constitute property); and *In re Aircrash in Bali, Indonesia on April 22, 1974*, 684 F.2d 1301, 1312 (9th Cir.1982), *cert. denied, Pan American World Airways, Inc. v. Causey*, 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989) (finding that wrongful death claims constitute property within the meaning of just compensation clause). None of these cases persuasively supports AFS's position. In *Omnia*, the Court found that an assignee's rights to acquire steel under a contract were vested

property rights, but were not necessarily taken when the government requisitioned the steel, preventing the assignee from acquiring it. *Omnia*, 261 U.S. at 508–10, 43 S.Ct. at 437–38. In dictum in *Aircrash in Bali*, the court indicated that a cause of action for the wrongful death of airplane passengers might constitute property within the meaning of the Fifth Amendment, but declined to determine whether there was a taking when the Warsaw Convention limited an airline's liability for wrongful death. *Aircrash in Bali*, 684 F.2d at 1312.

In *Coombes*, the court held that an amendment to a state constitution violated the impairment of contracts clause by ameliorating certain rights under a contract. *Coombes*, 285 U.S. at 448, 52 S.Ct. at 438. The court indicated that the impaired rights were purely contractual in nature and indicated that if the rights were statutorily created or derived, it would find no impairment. *Id.* at 447–48, 52 S.Ct. at 438. The case is distinguishable, because the right AFS seeks to enforce is its right to collect the entire filed rate, a right that is derived from the ICA and the filed rate doctrine emanating from the ICA. AFS is not seeking to enforce contractual rights; it seeks to ignore its contractual rights and obligations, i.e. the negotiated rates. Furthermore, as Justice Cardozo's dissent in *Coombes* emphasizes, contractual rights are not vested property rights until reduced to final judgment. *Id.* at 450–51, 52 S.Ct. at 439–40.

Even before the passage of the NRA, a cause of action for an undercharge represented no more than a potential for recovery. Shippers had defenses to an undercharge action, including the unreasonableness of the filed rate, the carrier's noncompliance with ICC tariff-participation rules or violation of ICC credit regulations. *See, e.g., Security Services, Inc. v. K Mart Corp.*, —— U.S. ——, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994) (holding that the bankrupt motor carrier was not entitled to recover for undercharges based on tariff rates that were void as a matter of law under the ICC's regulations); *ICC v. Transcon Lines*, —— U.S. ——, 115 S.Ct. 689, 130 L.Ed.2d 562 (1995) (holding that the filed rate doctrine did not bar the ICC from

obtaining injunctive relief to enforce the ICC's credit regulations in a manner that would prevent collection of a rate filed in a published tariff). These undercharge claims are not vested property rights protected by the Fifth Amendment.

 Even if the undercharge claims were vested property rights, the NRA does not effect a taking. The Takings Clause prevents the government from forcing a small segment of people to bear burdens which should in fairness be borne by the public as a whole. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) (citation omitted). In *Connolly*, the court set out three factors which have particular significance in identifying a "taking" forbidden by the Fifth Amendment: (1) the character of the governmental action; (2) the extent to which the regulation has interfered with "distinct investment-backed expectations"; and (3) the economic impact of the regulation on the claimant. *Id.* at 224–25, 106 S.Ct. at 1025–26 (citations omitted).

Legislation will survive the "character" test, if it "adjusts the benefits and burdens of economic life to promote the common good" rather than physically invading or permanently appropriating private property for public use. *Id.* at 225, 106 S.Ct. at 1026. The NRA in design and effect adjusts such benefits and burdens, to limit the inequitable recovery of undercharges from shippers who in good faith relied on the rates they negotiated with carriers. The NRA prevents a nonoperating carrier from using its insulation from market forces as a sword to change the terms of what had been a mutually acceptable relationship. The legislation furthers a substantial governmental purpose.

 In *Connolly*, the Court determined that a statute that changed an employer's liability for making withdrawals from a pension plan did not constitute a taking, in part because the employer had no investment-backed expectation that Congress would not enact legislation in the future that changed its liability under the pension plan. *Id.* at 226–27, 106 S.Ct. at 1026–27. Noting that pension plans have long been the subject of legislative action, the Court stated: "Those

who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.* at 227, 106 S.Ct. at 1027. That analysis is certainly applicable in the field of motor carrier transportation. The Interstate Commerce Act and its progeny, along with the promulgated regulations, have long governed motor carrier transportation. AFS could have no reasonable expectation that Congress would not continue to strive to achieve a deregulated industry as it had with the Motor Carrier Act of 1980. *See* discussion infra, pp. 964–965. Furthermore, a reasonable investment-backed expectation is not one based on an expectation that one will benefit from a loophole (such as the filed rate doctrine) in an existing regulatory scheme. *See Ciampitti v. United States,* 22 Cl.Ct. 310 (1991).

Regarding the "economic impact" factor, the *Connolly* Court indicated that the court should balance the economic impact against the need for the legislation. AFS argues that the NRA has a significant impact, by effecting an 80–100% deprivation of the value of its undercharge claims. However, stated another way, the NRA bestows on AFS 0–20% more than it bargained for. The NRA does not violate the Taking Clause of the Fifth Amendment.

## CONSTITUTIONALITY–EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment applies to state action and has no counterpart applicable to federal action. However, there is an implicit guarantee in the Due Process Clause of the Fifth Amendment that federal action that classifies people improperly may be invalid, if it treats similarly situated people in a dissimilar way. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 653, 95 S.Ct. 1225, 1235–36, 43 L.Ed.2d 514 (1975). Grossly unreasonable discrimination by the federal government violates the Due Process Clause of the Fifth Amendment. *See United States R.R. Retirement Board v. Fritz,* 449 U.S. 166, 173 n. 8, 101 S.Ct. 453, 458 n. 8, 66 L.Ed.2d 368 (1980), *reh'g denied,* 450 U.S. 960, 101 S.Ct. 1421, 67 L.Ed.2d 385 (1981).

AFS contends that the NRA denies AFS equal protection under the law, by unlawfully discriminating between operating and nonoperating motor carriers. Operating motor carriers may sue for undercharges, while nonoperating carriers are subject to the NRA. Shippers of nonoperating carriers can either challenge the filed rates as unreasonable, or elect the appropriate settlement provision provided for in § 10701(f)(2), (3) and (4). Thus, AFS contends, the NRA denies the full amount of undercharges to nonoperating carriers, while operating carriers can sue and potentially collect the full amount of their undercharges.

When legislation or other governmental action discriminates on the basis of a suspect classification, such as race, national origin or alienage, or when it infringes a fundamental right such as the right to privacy, right to vote, right to freedom of association or the right to travel, the classification or the infringement must be necessary to promote a compelling governmental interest. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 16, 93 S.Ct. 1278, 1287–88, 36 L.Ed.2d 16 (1973), *reh'g denied,* 411 U.S. 959, 93 S.Ct. 1919, 36 L.Ed.2d 418 (1973). However, when the action does not infringe upon a fundamental right and does not discriminate on the basis of a suspect classification, equal protection and due process are accorded if the discriminatory action has a rational relationship to legitimate governmental purposes. *Id.,* 411 U.S. at 40, 93 S.Ct. at 1300–01.

Economic legislation, regulating commerce and business transactions, satisfies due process and equal protection concerns so long as it has a rational purpose. Unless Congress achieved its purpose in a patently arbitrary or irrational way, due process is satisfied. *United States R.R. Retirement Board v. Fritz,* 449 U.S. at 177, 101 S.Ct. at 460–61. Legislation that adjusts the burdens and benefits of economic life is afforded substantial deference. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

From the voluminous legislative history, it is clear that the NRA is remedial, intended

to address a crisis of mammoth proportions that began in the trucking industry in the 1980s. As trucking companies suffered economic losses and downturns, they closed their doors and stopped operating; many filed bankruptcy. After they had ceased operations and ceased their ongoing relationship with their shipper customers, they began suing their former customers for "undercharges."

Before 1980, motor carriers set rates collectively, with antitrust immunity, through carrier organizations known as rate bureaus. The resulting class rates and tariffs were filed with the ICC and were applied uniformly, regardless of the carrier used. In 1980, Congress passed the Motor Carrier Act of 1980, Pub.L. 96–296, 94 Stat. 793 (July 1, 1980) ("MCA"), codified at 49 U.S.C. § 10101, with a goal of deregulating the industry. Despite the emphasis on deregulation of the industry, the high class rates were not abandoned. At the same time, carriers competed in the deregulated market by negotiating individual discounted rates with their shipper customers. Carriers and the shippers conducted business on the basis of their negotiated rates, largely ignoring the higher, filed rate. However, when a carrier ceased operations it no longer had customers. It had no incentive to maintain goodwill with former customers. Rather, the carrier had an incentive to liquidate assets and collect old debt.

In *Reiter v. Cooper*, —— U.S. ——, ——, 113 S.Ct. 1213, 1216, 122 L.Ed.2d 604, 612–13 (1993), the court spoke of "a pattern that has been replicated many times in the era of 'deregulation' following the Motor Carrier Act of 1980," and described a typical case as follows:

> A motor carrier negotiates with a shipper rates less than the tariff rates that the Interstate Commerce Act ... requires the carrier to "publish and file" with the ICC ... After the shipments are delivered and paid for (sometimes years after), the carrier goes bankrupt and its trustee in bankruptcy sues the shipper to recover the

> difference between the negotiated rates and the tariff rates.

*Id.* (citations omitted). A proliferation of undercharge litigation developed, often at the instance of bankruptcy trustees or debtors in possession. In response, the ICC adopted a policy that permitted carriers and shippers to supersede the carrier's filed rates with negotiated rates, and further determined that it was an unreasonable practice for a carrier to attempt to retroactively collect the filed rate after having negotiated, billed, and collected a lower, unfiled rate. However, in 1990, the Supreme Court confirmed the viability of the "filed rate doctrine," allowing a carrier to recover the full amount of its undercharge claim despite the existence of an unfiled, negotiated rate, so long as the filed rate was reasonable. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Supreme Court reasoned that the ICC could not adopt a policy that ameliorated the filed rate doctrine when Congress chose to keep the doctrine intact even while deregulating the motor carrier industry with the MCA. *Id.* at 134–35, 110 S.Ct. at 2770–71. The Supreme Court noted the possibility of a legislative remedy:

> If strict adherence to §§ 10761 and 10762 as embodied in the filed rate doctrine has become an anachronism in the wake of the MCA, it is the responsibility of Congress to modify or eliminate these sections.

*Id.* at 135–36, 110 S.Ct. at 2771.

The Negotiated Rates Act of 1993 was the legislative response to *Maislin.*[7] It gives shippers alternative remedies for dealing with undercharge claims by allowing them to raise a defense that the filed rate is itself unreasonable; or alternatively, pay a percentage of the claim pursuant to the settlement provisions of the NRA. *See* 49 U.S.C. § 10701(f). If the shipper is a small business concern, it is given amnesty from any liability on the undercharge claims. *Id.* at § 10701(f)(9). Shippers of recyclable materials and shippers that are charitable organiza-

---

7. Congress later passed the Trucking Industry Regulatory Reform Act of 1994 (TIRRA), Pub.L. 103–311, Title II (Aug. 26, 1994) which largely eliminated the requirement that motor carriers file their tariff rates. TIRRA is applied prospectively, and expressly does not affect application of the NRA to undercharge claims for transportation provided prior to its enactment.

tions are also imparted amnesty from undercharges. *Id.*

In limiting its application to carriers who are no longer transporting property, Congress recognized that undercharge claims are peculiarly the treasure trove of those who no longer care about maintaining customer relations. A carrier who continues to transport property is driven by market forces and competition, and thus charges, collects, and relies solely on competitively set rates. Only carriers who are no longer in the market have the temerity to sue customers based on a rate they were happy to ignore when their transactional relation was alive and well. The NRA's application to nonoperating carriers, but not operating carriers, is entirely consistent with the remedial underpinnings of this legislation. Furthermore, this limited application is consistent with Congress' reliance, beginning with the MCA, on "an approach emphasizing market discipline, in contrast to public utility-style ratemaking, as the principal regulator of motor carriers." *Central & Southern Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301, 311 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).'

The discriminatory treatment of carriers who are no longer transporting property represents Congress's attempt to tailor the remedy to the class of carriers who were causing the crisis. Thus, it is discrimination that is rational in purpose and design. The NRA does not violate AFS's right to due process or equal protection under the law.

### CONCLUSION

The NRA applies to AFS as a motor carrier no longer transporting property, and Section 9 of the NRA does not defeat its application to a motor carrier who is in bankruptcy. AFS's causes of actions for undercharges passed into and became property of the estate pursuant to § 541. The nature and extent of AFS's causes of actions are governed by nonbankruptcy law, in this case the ICA and the NRA. The retroactive application of the NRA, which reduces or eliminates AFS's potential recovery on undercharge claims, does not unconstitutionally impair its contracts nor violate the Taking Clause, as the claims are not vested property rights under the Fifth Amendment and are permissibly affected by economic legislation with a rational basis. Furthermore, the NRA, having a rational legislative basis does not deny AFS equal protection or substantive due process. Finally, the NRA is not unconstitutionally vague.

**IT IS THEREFORE ORDERED BY THE COURT** that summary judgment shall be entered for defendants on AFS's complaint for injunctive and declaratory relief.

**IT IS FURTHER ORDERED BY THE COURT** that the Negotiated Rates Act of 1993 is constitutional and applicable to AFS.

**IT IS FURTHER ORDERED BY THE COURT** that American Freight System, Inc. shall give notice to all parties to its adversary proceedings of this Court's ruling that the Negotiated Rates Act of 1993 is constitutional and applicable to AFS. American Freight System, Inc. and the defendants in each adversary proceeding shall jointly submit a report to the Court by *April 21, 1995,* indicating what matters are ready for referral to the ICC and what matters remain before the Court.

This Memorandum shall constitute findings of fact and conclusions of law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by Rule 9021 of the Federal Rules of Bankruptcy Procedure and Rule 58 of the Federal Rules of Civil Procedure.

IT IS SO ORDERED.