DIANA E. MURPHY, Circuit Judge.
Jones Truck Lines, Inc. (Jones) appeals from summary judgments entered in favor of a number of shippers. The district court[1] concluded that the Negotiated Rates Act of 1993 (NRA) prevented Jones from recovering undercharges from the shippers. Jones argues that the NRA does not apply to a carrier in bankruptcy and that such an application would be an unconstitutional taking. We affirm.
I.
Jones is a trucking company which transported goods for each of the shippers at a negotiated rate; each shipper apparently paid the charges as billed. After Jones filed for bankruptcy under Chapter 11 on July 9, 1991, it stopped transporting goods but continued as a debtor in possession. Management reviewed its records and decided to sue the shippers for the difference between the negotiated rate they had paid and the higher filed rate.[2]
Until 1980, the trucking industry was highly regulated. Under the filed rate doctrine, carriers were required to file their rates with the Interstate Commerce Commission (ICC) pursuant to the Interstate Commerce Act, 49 U.S.C. § 10101 et seq. Carriers were not to charge a different rate unless it too was filed. See Maislin Industries, U.S. v. Primary Steel, Inc., 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).
After Congress passed the Motor Carrier Act of 1980 (MCA), Pub.L. 96-296, 94 Stat. 793, carriers began negotiating lower rates with shippers with the approval of the ICC, but the negotiated rates were often not filed. When carriers went bankrupt during the 1980s, they then frequently sought to collect the higher filed rates, but the ICC often ruled in favor of shippers’ claims that they should not be required to pay the higher rate when they had negotiated a lower one. See, e.g., NITL — Petition to Institute Rulemak-ing on Negotiated Motor Common Carrier Rates, 3 I.C.C.2d 99, 106 (1986).
In 1990, the Supreme Court ruled that the MCA had not repealed the filed rate doctrine and that the ICC had exceeded its authority by ignoring the requirement that the filed rate was the only lawful rate. Maislin Industries, U.S. v. Primary Steel, Inc., 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). “If strict adherence to §§ 10761 and 10762 as embodied in the filed rate doctrine has become an anachronism in the wake of the MCA, it is the responsibility of Congress to modify or eliminate these sections.” Id. at 135-36, 110 S.Ct. at 2770-71.
Within months of the Maislin decision, bills were introduced in both houses of Congress to counteract its effects. See S. 2933 and H.R. 3243, 101st Cong., 2d Sess. (1990); S.Rep. No. 448, 101st Cong., 2d Sess. (1990). Congress eventually passed the NRA in November 1993, and President Clinton signed it on December 3,1993. P.L. No. 103-180, 107 Stat. 2044, (codified at 49 U.S.C. § 10701(f) and at scattered sections of that title, including amendments to §§ 10761 and 10762).
Most provisions of the NRA apply only to carriers no longer transporting property. 49 U.S.C. § 10701(f)(1). The statute provides a settlement option for shippers faced with undercharge claims. Shippers may choose to settle such claims at five to twenty percent of their value. § 10701(f)(2)-(4). It also exempts small businesses, charities, and shippers of recyclable materials from undercharge suits. § 10701(f)(9). Jones did not contest before the district court that the *645 appellee shippers are small businesses pursuant to that subsection, and on that basis summary judgments were granted.
II.
On appeal Jones argues that Congress did not intend the NRA to apply to bankrupt carriers, that the Bankruptcy Code precludes nonbankruptey statutes from affecting the value of property in the estate, and that application of the NRA to it would result in an unconstitutional taking. The United States intervened in these appeals to defend the constitutionality of the NRA and its applicability to Jones.
A.
Although the NRA does not discuss bankrupt carriers, the legislative history has many references to them. Bankrupt carriers were causing a litigation crisis by bringing hundreds of thousands of undercharge claims. See, e.g., The Negotiated Rates Issue and Proposed Legislative Solutions Thereto: Hearing before the Subcomm. on Surface Transportation of the House Comm, on Public Works and Transportation, 103d Cong., 1st Sess. 1-10, 140 (1993); 139 Cong. Rec. H9596-9598 (November 15,1993); id. at § 16186-87 (November 18, 1993). Opponents of the NRA were concerned that employees of bankrupt carriers would not receive compensation owed them if carriers could not collect the undercharges. See, e.g., 139 Cdng.Rec. H9597 (November 15, 1993) (comments of Congressman Lipinski).
Jones contends that Congress originally envisioned that the NRA would reach bankrupt carriers, but that a last minute amendment excluded them. Jones points to § 9 of the NRA, 49 U.S.C. § 10701 note, which was added by the House after S. 412 had already passed in the Senate. It reads:
Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy; title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.
Jones argues that the plain meaning of § 9 is that the NRA is not intended to apply to bankrupt carriers. It contends that if the NRA is read as divesting bankrupt carriers of their undercharge claims, it is “limiting or otherwise affecting application of title 11.”
The meaning of § 9 is not so clear. “Limiting” and “affecting” are terms which are susceptible to both very narrow and very broad constructions. It is therefore appropriate to look to the legislative history to insure that our reading is consistent with congressional intent.
Jones argues that several letters written by members of Congress indicate that a political compromise led to a retreat from application of the NRA to bankrupt carriers. The Senate passed its version of the NRA on July 1, 1993. Shortly before the House was to consider H.R. 2121 in November, Congressman Jack Brooks, chair of the House Committee on the Judiciary, requested that the bill be referred to his committee before coming to a vote on the floor. He wrote to Congressman Norman Mineta, chair of the Committee on Public Works and Transportation, and the leading sponsor of H.R. 2121:
As you know under [House rules, the Committee on the Judiciary] has jurisdiction over “bankruptcy” and “Federal Courts.” Based on this jurisdiction, we are concerned that H.R. 2121, as currently drafted, could be construed to limit or otherwise affect application of Title 28, United States Code, relating to the jurisdiction of the courts of the United States (including bankruptcy courts). On the basis of these concerns and others, our Committee has requested sequential referral of the bill.
However, it is my understanding that as a result of staff discussions on this issue, amended language will be included in the version of H.R. 2121 to be called-up on suspension that will make it clear that nothing in the bill shall be construed as limiting or otherwise affecting Title 28, United States Code, relating to the juris *646 diction of the courts of the United States (including bankruptcy courts).
H.R.Rep. No. 359, 103d Cong., 1st Sess. 16-17, reprinted in 1993 U.S.C.C.A.N. 2534, 2543-44 (internal rule citations omitted). Congressman Mineta responded:
Because of your Committee’s jurisdiction over Federal courts and bankruptcy, I recognize your right to request a sequential referral of H.R. 2121. However, and in accordance with your letter, I am pleased that we were able to agree on language clarifying that we do not intend in this legislation to affect[ ] either the Bankruptcy Code or the jurisdiction of the bankruptcy courts. Based on our agreement, it is my understanding that you will not pursue your request for sequential referral.
Id. Jones claims that these communications show that Congress intended that the NRA not apply to bankrupt carriers.
Statements during the House floor debate indicate that § 9 was not meant to exempt bankrupt carriers from the provisions of the NRA. After he wrote the correspondence relied on by Jones, Congressman Brooks said on the floor:
Mr. Speaker, as Mr. Mineta has noted, the Committee on the Judiciary had earlier expressed concern that H.R. 2121, the Negotiated Rates Act of 1993, as ordered reported by the Committee on Public Works and Transportation, could have been construed to limit the jurisdiction of the Federal courts, including the bankruptcy courts. However, pursuant to an understanding between the Committee on the Judiciary and the Committee on Public Works and Transportation, Mr. Mineta has offered an amendment to section 9 of H.R. 2121 clarifying that nothing in the proposed act shall be construed to limit or otherwise affect the jurisdiction of the Federal courts to make determinations in bankruptcy eases and proceedings.
Under current law, the Federal courts (and the bankruptcy courts) have broad jurisdiction to make determinations in cases filed under the Bankruptcy Code_ Despite their broad jurisdictional authority, where time permits and pursuant to the doctrine of primary jurisdiction, the Federal courts may choose to defer to the expertise of the Interstate Commerce Commission [ICC] with respect to specific issues. See Reiter v. Cooper, [— U.S. -], 113 S.Ct. 1213 [122 L.Ed.2d 604] (1993). Once the ICC has considered the matter, the applicable Federal court, may choose to incorporate some or all of the ICC’s findings into the overall adjudication of the bankruptcy case.
The current procedure permits the Federal courts to assure the timely and fair administration and adjudication of bankruptcy cases. Pursuant to changed language of section 9 of the act from the language reported from the Public Works Committee, the Federal courts including the bankruptcy courts, will continue to have jurisdiction to make determinations in connection with motor carrier undercharge claims and related issues where the motor carrier has sought the protection of the Bankruptcy Code. As a result of this provision, in the event of a bankruptcy filing, reference in the act to resolution by, determinations by, and review and approval by the Commission shall be subject to the original jurisdiction of the Federal courts pursuant to 28 U.S.C. 157 and 1334.
139 Cong.Rec. H9603 (November 15, 1993); see also id. at H9598 (comments of Congressman Petri).
The comments of Congressman Brooks make clear that § 9 was a response to concerns that portions of the NRA would transfer jurisdiction over bankrupt carriers to the ICC. See 49 U.S.C. § 10701(f)(1); § 2(e) of the NRA, 49 U.S.C. § 10701 note. Especially the last sentence shows that the NRA is applicable to bankrupt carriers, because if it were not, the jurisdictional interrelationship between bankruptcy courts and the ICC discussed by Congressman Brooks would be irrelevant. His comments are therefore consistent only with the conclusion that the NRA was to apply to bankrupt carriers.[3] The remainder of the floor debate in both the *647 House and Senate confirms this conclusion. See, e.g., 139 Cong.Rec. § 16186-87 (November 18, 1993) (comments of Sens. Hollings and Danforth).
B.
Jones next argues that two sections of the Bankruptcy Code preclude the application of the NRA to Jones’ undercharge claims. Jones contends that pursuant to 11 U.S.C. § 541(c)(1) the undercharge claims became the property of the estate and that under 11 U.S.C. § 363(() the debtor’s exercise of those claims may not be limited by the NRA. Section 541(c)(1) states that property of the debtor becomes property of the estate notwithstanding “applicable nonbankruptcy law ... that is conditioned on the insolvency or financial condition of the debtor ... and that effects or gives an option to effect a forfeiture, modification, or termination of the debt- or’s interest in property.” Section 363(Z) provides that “the trustee may use, sell, or lease property ... notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, ... and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debt- or’s interest in such property.” Jones argues that the NRA would cause a “forfeiture, modification, or termination” of the undercharge claims under both of these sections and that they therefore are inapplicable.
The shippers and the United States respond that 49 U.S.C. § 10701(f)(9) exempts small businesses, charities, and recyclers from all undercharge claims regardless of the financial or operating status of the carrier. They also argue that, even if that exemption applies only to claims made by nonoperating carriers, the NRA does not conflict with the Bankruptcy Code provisions relied on by Jones. They contend that in either case the undercharge claims are subject to the NRA even after passing into the bankruptcy estate under 11 U.S.C. § 541.
Before a shipper confronted with an undercharge claim may avail itself of the settlement provisions of the NRA, it must prove that the carrier is no longer transporting property and that the shipper reasonably relied on and paid an unfiled rate offered by the carrier. § 10701(f)(1)(A), (B). Small businesses, charities, and recyclers may bypass the settlement procedure and defeat undercharge claims by raising the exemption in § 10701(f)(9), which reads:
Notwithstanding paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier’s applicable and effective tariff rate and the rate originally billed and paid—
(A) if such person qualifies as a small-business concern under the Small Business Act (15 U.S.C. 631 et seq.),
(B) if such person is an organization which is described in section 501(e)(3) of the Internal Revenue Code of 1986 [26 USCS § 501(c)(3) ] and exempt from tax under section 501(a) of such Code [26 USCS § 501(a) ], or
(C) if the cargo involved in the claim is recyclable materials, as defined in section 10733.
Jones argues that a shipper must also show that a carrier making an undercharge claim has ceased operations before it can use the small business exemption. The shippers respond that the exemption applies regardless of a carrier’s operating status. The answer must be found by examining the relevant sections of the statute.
Paragraphs (2), (3), and (4) referenced in § 10701(f)(1) are the settlement provisions. That part of the law explicitly requires that a shipper prove a carrier is not transporting property before the shipper is entitled to *648 choose a settlement option.[4] Section 10701(f)(1) does not, however, include the small business exemption paragraph in the list of paragraphs which may only be exercised upon such a showing.
Jones argues that the omission of the exemption paragraph in that list is irrelevant because the exemption is available “notwithstanding” paragraphs (2), (3), and (4). It asserts that a small business must therefore reach one of those three paragraphs before it may exercise the exemption. This argument is not persuasive. Congress included paragraph (9) along with (2), (3), and (4) in § 10701(f)(7). Had it meant to make the small business exemption contingent on operating status, it could have included a reference to paragraph (9) in § 10701(f)(1) as well. That Congress did not suggests, therefore, that a shipper need not prove that a carrier is no longer transporting property before taking advantage of the exemption. See In re Lifschultz Fast Freight Corp., 174 B.R. 271, 273-74 (N.D.Ill.1994).
Any ambiguity in the text is resolved by the legislative history which makes it clear that small businesses were to be exempt. The House committee report on its bill states:
In addition, the bill declares amnesty for claims involving small shippers, charitable organizations, and recyclers. The Committee believed that these groups should not be held liable for any of the undercharge claims pending against them.
H.R.Rep. No. 359, 103d Cong., 1st Sess. 10, reprinted in 1993 U.S.C.C.A.N. 2534, 2537. During floor debate on the bill as amended by the House, Senator Danforth stated that the NRA would “totally exempt[ ] small shippers from undercharge claims.”[5] 139 Cong. Rec. S16187 (November 18, 1993). Senator Hollings made a similar statement, although somewhat ambiguous.[6] See id. at S16186. Taken as a whole the legislative history supports our reading of § 10701(f)(9). Congress *649 intended to exempt small businesses, chart-ties, and recyclers from all undercharge claims. Because Jones has not disputed that all of the shippers in these cases are small businesses, the grants of summary judgment were proper.
The NRA is applicable despite the Bankruptcy Code sections for a second reason. Even if the shippers were not small businesses, the NRA would apply to these claims because the act hinges on whether a carrier is still transporting property, not on its financial condition. As appellees note, carriers in bankruptcy may continue to operate, see Gross Common Carrier v. A.B. Dick Co., 861 F.Supp. 638, 641 (N.D.Ill.1993), and solvent carriers may cease operations for other reasons. Because both of the Bankruptcy Code sections relied on by Jones require that a nonbankruptcy law treat bankrupt carriers differently than nonbankrupt carriers, the NRA is unaffected by them.
Jones argues that the NRA’s reference to carriers no longer transporting property in reality turns on a carrier’s financial condition and therefore the code sections block application of the NRA. There is no reason to question the plain meaning of the language used by Congress, however.[7] The distinction between operating and nonoperating carriers is a sensible one that furthers the NRA’s purpose. Carriers which are still operating, whether bankrupt or not, have an incentive to maintain good relations with their customers and are less likely to file undercharge claims. Regardless of their financial condition, nonoperating carriers have no such incentive and seem much more likely to pursue undercharge claims. Congress knew in fact that some carriers had ceased operations solely in order to file undercharge claims. The Negotiated Rates Issue and Proposed Legislative Solutions Thereto: Hearing before the Subcomm. on Surface Transportation of the House Comm, on Public Works and Transportation, 103d Cong., 1st Sess. 60 (1993). That many and perhaps most nonop-erating carriers have also filed for bankruptcy undermines neither the logic of the line Congress drew nor the clarity with which it was drawn.[8]
The NRA and the Bankruptcy Code are not inconsistent. The NRA is not conditioned on a carrier’s financial status. Undercharge claims do pass into the bankruptcy estate under 11 U.S.C. § 541, but they come into the estate with their own characteristics. The NRA has already become applicable to the claims of carriers which ended operations before filing for bankruptcy, but it does not apply to the claims of those who file while still transporting property until they stop transportation. Operating status is irrelevant with regard to shippers exempted by paragraph (9). Nothing in the NRA conditioned on the financial situation of Jones caused a forfeiture, modification, or termination of the carrier’s property interest in its claims, either upon filing, § 541(c)(1), or later, § 363(().
C.
Finally, Jones claims that the retrospective application of the NRA works an unconstitutional taking by limiting or eliminating the value of undercharge claims which existed before passage of the statute. The fifth amendment prohibits the taking of private property for public use without just compensation. U.S. Const, amend. V. Jones argues that the NRA deprives carriers of *650 their causes of action for undercharges without compensation.[9]
The Supreme Court set the standard for deciding whether a congressional act should be applied retrospectively in the face of a taking challenge in United States v. Security Industrial Bank, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982). Where there is substantial doubt about the constitutionality of a provision, the statute should be construed, if possible, as being only prospective. Id. at 79-80, 103 S.Ct. at 412-13. Because the bankruptcy statute at issue there involved valid preexisting liens, the Court concluded substantial doubt existed and read the statute as prospective. Id. at 81, 103 S.Ct. at 413-14.
Jones argues that the NRA should be construed as affecting only rights which accrued after its passage. Because the NRA explicitly states that it is to be applied retrospectively, it is not susceptible to such an interpretation. 49 U.S.C. § 10701(f)(8)(C); P.L. 103-180 § 2(c), 49 U.S.C. § 10701 note. Furthermore, close analysis leads to the conclusion that the nature of the statute and the property right at issue do not create a substantial doubt as to the NRA’s constitutionality.[10]
The purpose of the taking' clause is “to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Fairness and justice would not appear to require finding a taking in the typical undercharge case. The carriers now seeking marginal compensation offered discounted rates to shippers in the past and then failed to file the rate as required by law. After the shippers paid the agreed rate, carriers then sued for more. There are many examples in the legislative history of how inequitable this practice was to shippers. See, e.g., The Negotiated Rates Issue and Proposed Legislative Solutions Thereto: Hearing before the Subcomm. on Surface Transportation of the House Comm, on Public Works and Transportation, 103d Cong., 1st Sess. 7-9 (1993); 139 Cong. Ree. H9596-9597 (November 15, 1993).
Whether a government action is an unconstitutional taking depends on three factors: the nature of the governmental action, the extent to which the regulation has interfered with “distinct investment-backed expectations,” and the economic impact of the regulation on the claimant. Connolly v. Pension Benefit Guaranty Corp., 475 U.S. 211, 224-25, 106 S.Ct. 1018, 1025-26, 89 L.Ed.2d 166 (1986) (citations omitted).
The governmental action in these cases supports the conclusion that there was no unconstitutional taking. The NRA does not physically invade Jones’ property or procure it for the government’s own use. Confronted by a rash of undercharge litigation in the courts, Congress reallocated the potential liability as it thought fair. As in Connolly, the interference with Jones’ property “arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and, under [the Court’s] cases, does not constitute a taking requiring government compensation.” Id. at 225, 106 S.Ct. at 1026.
Jones claims that it had a legitimate expectation that it would be able to collect the undercharges based on the Supreme Court’s Maislin decision. We disagree. The ICC recognized negotiated rates throughout much of the 1980s, a practice upheld by most of the circuits which considered the issue. See H.R.Rep. No. 359, 103d Cong., 1st Sess. 8, reprinted in 1993 U.S.C.C.A.N. 2534, 2535. *651 Jones could not have reasonably expected to collect undercharges during that period, When the Supreme Court announced the Maislin decision, it also mentioned Congress had the ability to amend the filed rate doctrine. 497 U.S. 116, 135-36, 110 S.Ct. 2759, 2770-71, 111 L.Ed.2d 94 (1990). As noted above, Congress began considering undercharge legislation almost immediately, and bills were pending continually until the NRA was enacted in 1993. Jones, other carriers, and their creditors should have known that Congress could eliminate undercharges at any time.
The carriers’ expectation that they could collect undercharges is therefore less justified than the expectation of the employers in Connolly that they would be able to withdraw from multiemployer pension plans. Connolly, 475 U.S. at 226-27, 106 S.Ct. at 1026-27. The trucking industry was heavily regulated throughout the relevant period, and carriers were on notice that negotiated rates either were being enforced or might be protected by statute at any time. Jones, other carriers, and their creditors can hardly have been surprised by the provisions of the NRA, and any expectation of the carriers that they would be able to collect more than they had bargained for is not enough to support a finding of a taking.
The final consideration is the economic impact of the NRA on Jones, which claims that it is being deprived of the value of its undercharge claims. In these cases, Jones stands to lose the entire value of its claims because the shippers are small businesses and are therefore exempt. As in Connolly, however, the economic impact of the NRA is not assessed in a vacuum. Id. at 225-26,106 S.Ct. at 1026-27. Any economic loss to a carrier is directly related to the carrier’s own actions: its offers of discounted rates and its failure to file them.
Furthermore, any economic impact based on the loss of causes of action is somewhat speculative. Even had the NRA not been enacted, shippers may have been able to defeat the claims by counterclaiming that the filed rate was unreasonable. Reiter v. Cooper, — U.S. -, - - -, 113 S.Ct. 1213, 1217-21, 122 L.Ed.2d 604 (1993); cf. ICC v. Transcon Lines, — U.S. -, -, 115 S.Ct. 689, 695, 130 L.Ed.2d 562 (1995); Trans-Allied Audit Co. v. I.C.C., 33 F.3d 1024 (8th Cir.1994). Causes of action are also not fully vested interests until reduced to final judgment. See In re Consolidated United States Atmospheric Testing Litigation, 820 F.2d 982, 989 (9th Cir.1987), cert. denied, Konizeski v. Livermore Labs, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988). We conclude therefore that the projected economic impact on Jones is not sufficiently concrete to establish a taking, especially when the other Connolly factors are considered.[11]
Jones argues that cases such as Hodel v. Irving, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987), compel the opposite result. In Hodel, the Court ruled that Congress could not eliminate the ability of Native Americans to devise their undivided interests in land. After assessing the investment-backed expectation and economic impact factors, the Court stated, “If we were to stop our analysis at this point, we might well find [the statute] constitutional.” It found a taking, however, because the government was eliminating an ancient right, “one of the most essential sticks in the bundle of rights that are commonly characterized as property.” Id. at 716, 107 S.Ct. at 2083 (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 391, 62 L.Ed.2d 332 (1979)). Viewed in the light argued by Jones, the NRA limits a right that was created by statute in this century. Viewed in the light of the whole record, the NRA closes a statutory loophole which allowed carriers to capitalize on their own choices to ignore the law. In either light, the right is not essential and deserves considerably less weight than the right to devise in Hodel. We therefore conclude that the NRA is a valid exercise of congressional authority to regulate commerce, not an unconstitutional taking.
*652 III.
For these reasons, we conclude that the NRA is applicable to bankrupt carriers, does not conflict with the Bankruptcy Code, and does not work an unconstitutional taking. Accordingly, we affirm the district court’s grants of summary judgment in favor of the defendant shippers.

. The Honorable H. Franklin Waters, Chief United States District Judge for the Western District of Arkansas.

. Most of these actions were brought originally as adversary proceedings in the bankruptcy court. The district court granted the shippers’ motions to withdraw the references to the bankruptcy court pursuant to 28 U.S.C. § 157(d).

. The great majority of district and bankruptcy courts that have addressed this issue have *647 reached the same conclusion. See, e.g., In re Americana Expressways, Inc., 177 B.R. 960, 963-65 (D.Utah 1995), rev’g., 172 B.R. 99, 101 (Bankr.D.Utah 1994); In re American Freight System, Inc., 179 B.R. 952, 957-59 (Bankr.D.Kan.1995); but see In re Bulldog Trucking, Inc., 173 B.R. 517 (W.D.N.C.1994).

. 49 U.S.C. § 10701(f)(1) reads:
In general. When a claim is made by a motor carrier of property (other than a household goods carrier) providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title [49 USCS §§ 10521 et seq.], by a freight forwarder (other than a household goods freight forwarder), or by a party representing such a carrier or freight forwarder regarding the collection of rates or charges for such transportation in addition to those originally billed and collected by the carrier or freight forwarder for such transportation, the person against whom the claim is made may elect to satisfy the claim under the provisions of paragraph (2), (3), or (4) of this subsection, upon showing that—
(A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding the application of this subsection; and
(B) with respect to the claim—
(i) the person was offered a transportation rate by the carrier or freight forwarder other than that legally on file with the Commission for the transportation service;
(ii) the person tendered freight to the carrier or freight forwarder in reasonable reliance upon the offered transportation rate;
(iii) the carrier or freight forwarder did not properly or timely file with the Commission a tariff providing for such transportation rate or failed to enter into an agreement for contract carriage;
(iv) such transportation rate was billed and collected by the carrier or freight forwarder; and
(v) the carrier or freight forwarder demands additional payment of a higher rate filed in a tariff.
If there is a dispute as to the showing under subparagraph (A), such dispute shall be resolved by the court in which the claim is brought. If there is a dispute as to the showing under sub-paragraph (B), such dispute shall be resolved by the Commission. Pending the resolution of any such dispute, the person shall not have to pay any additional compensation to the carrier or freight forwarder. Satisfaction of the claim under paragraph (2), (3), or (4) of this subsection shall be binding on the parties, and the parties shall not be subject to chapter 119 of this title [49 USCS §§ 11901 et seq.].

. The version of S. 412 that originally passed in the Senate required that small businesses satisfy the criteria eventually codified at § 10701(f)(1)(A), (B). S. 412, 103d Cong., 1st Sess. (1993) (paragraph which would have been codified at 49 U.S.C. § 10701(f)(6)); S.Rep. No. 79, 103d Cong., 1st Sess. 6 (1993). That requirement was not included in the final language of the NRA.

. Senator Hollings stated, “Small businesses, charitable organizations, and recyclers ... would *649 be exempt from applicable undercharge claims." 139 Cong.Rec. § 16186 (November 18, 1993). The context does not make clear what the Senator meant by "applicable”.

. Because Congress has the authority to amend the Bankruptcy Code, it is unlikely that it would use a phrase like "no longer transporting property” to circumvent title 11.

. Lower courts are generally in accord with this result. See, e.g., In re American Freight System, Inc., 179 B.R. 952, 960 (Bankr.D.Kan.1995); In re Parker Refrigerated Service, Inc., 173 B.R. 704, 711-16 (Bankr.W.D.Wash.1994) (additional cases listed at 711); but see, e.g., In re Bulldog Trucking, Inc., 173 B.R. 517 (W.D.N.C.1994).

. The United States argues that the alleged taking of the undercharge claims is not ripe for review because Jones might be entitled to pursue compensation from the government in the Claims Court under the Tucker Act, 28 U.S.C. § 1491(a)(1). Preseault v. I.C.C., 494 U.S. 1, 11-17, 110 S.Ct. 914, 921-925, 108 L.Ed.2d 1 (1990). It is unclear from the record, however, what amount Jones seeks from each of the shippers in these cases, and claims less than $10,000 can be considered by the federal district court instead of the Claims Court. 28 U.S.C. § 1346(a)(2). We therefore reach the merits.

. In its brief, Jones mentions the due process clause of the fifth amendment in passing but does not develop any theory that might apply to this case. See Connolly, 475 U.S. at 223, 106 S.Ct. at 1025; Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976).

. Several lower courts have concluded that retrospective application of the NRA does not effect an unconstitutional taking. See, e.g., In re Americana Expressways, Inc., 177 B.R. 960, 966-67 (D.Utah 1995), rev’g., 172 B.R. 99, 101 (Bankr.D.Utah 1994); In re American Freight System, Inc., 179 B.R. 952, 961-64 (Bankr.D.Kan.1995).