In re BULLDOG TRUCKING, INCORPO-
RATED, formerly known as Bulldog
Trucking of Georgia, Incorporated, a
Delaware corporation, Debtor.

Langdon M. COOPER, Trustee for
Bulldog Trucking, Incorporated,
Plaintiff–Appellee,

v.

B & L, INCORPORATED,
Defendant–Appellant,

United States of America; Interstate
Commerce Commission, Amici
Curiae.

In re BULLDOG TRUCKING, INCORPO-
RATED, formerly known as Bulldog
Trucking of Georgia, Incorporated, a
Delaware corporation, Debtor.

Langdon M. COOPER, Trustee for
Bulldog Trucking, Incorporated,
Plaintiff–Appellee,

v.

SHAW'S EXPRESS, INCORPORATED,
Defendant–Appellant,

United States of America; Interstate
Commerce Commission, Amici
Curiae.

In re BULLDOG TRUCKING, INCORPO-
RATED, formerly known as Bulldog
Trucking of Georgia, Incorporated, a
Delaware corporation, Debtor.

Langdon M. COOPER, Trustee for
Bulldog Trucking, Incorporated,
Plaintiff–Appellee,

v.

CANAAN BROKERAGE, INCORPORAT-
ED; Agrolinz, Incorporated; Delta and
Pine Land Company; J.C. Penney Com-
pany, Incorporated; Levelland Compress
Company, Incorporated; N.L. Daughtry
Fertilizer Company; Terra Internation-
al, Incorporated; Tifton Aluminum Pro-
cessing, Incorporated; Waverly Textile
Processing, Incorporated, Defendants–
Appellants,

United States of America; Interstate
Commerce Commission, Amici
Curiae.

In re BULLDOG TRUCKING, INCORPO-
RATED, formerly known as Bulldog
Trucking of Georgia, Incorporated, a
Delaware corporation, Debtor.

Langdon M. COOPER, Trustee for
Bulldog Trucking, Incorporated,
Plaintiff–Appellee,

v.

MEREDITH TRANSPORT, INCORPO-
RATED; American Manufacturing Mu-
tual, Defendants–Appellants,

United States of America; Interstate
Commerce Commission, Amici
Curiae.

Nos. 94–2002, 94–2003, 94–
2005 and 94–2006.

United States Court of Appeals,
Fourth Circuit.

Argued June 8, 1995.

Decided Oct. 10, 1995.

**ARGUED:** Paul H. Lamboley, Grove, Jaskiewicz, Gilliam & Cobert, Washington, DC, for Appellants. Charles Derrick Stodghill, Civil Division, United States Department of Justice, Washington, DC, for Amici Curiae. Joseph L. Steinfeld, Jr., Shawn, Mann & Niedermayer, L.L.P., Washington, DC, for Appellee. **ON BRIEF:** Frank W. Hunger, Assistant Attorney General, Mark T. Calloway, United States Attorney, J. Christopher Kohn, Tracy J. Whitaker, Civil Division, United States Department of Justice, Washington, DC; Henri F. Rush, General Counsel, Ellen D. Hanson, Deputy General Counsel, Theodore K. Kalick, Virginia Strasser, Interstate Commerce Commission, Washington, DC, for Amici Curiae. John T. Siegler, Shawn, Mann & Niedermayer, L.L.P., Washington, DC; Langdon M. Cooper, Alala, Mullen, Holland & Cooper, P.A., Gastonia, North Carolina, for Appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and FABER, United States District Judge for the Southern District of West Virginia, sitting by designation.

Vacated and remanded by published opinion. Judge WIDENER wrote the opinion, in which Judge MURNAGHAN and Judge FABER joined.

## OPINION

WIDENER, Circuit Judge:

This consolidated appeal requires us to decide whether certain provisions of the Negotiated Rates Act of 1993, Pub.L. No. 103–180, 107 Stat. 2044, apply to proceedings in bankruptcy. In each case, the trustee for Bulldog Trucking, Inc., a bankrupt motor carrier, sought undercharges for shipping services provided to a shipper at the instance of a transportation broker.

The district court entered orders in each of four non-core adversary proceedings on June 21, 1994. The court decided that §§ 2 and 8 of the Negotiated Rates Act of 1993 (Rates Act)[1] were inapplicable to the bankrupt estate of Bulldog Trucking, granted summary judgment in favor of Bulldog's trustee on his claims for undercharges, certified the judgments under F.R.Civ.P. 54(b)[2], and stayed

---

1. Portions of the Rates Act are codified in various sections of Title 49, United States Code. See 49 U.S.C. § 10701(f) (codifying NRA § 2(a)); 49 U.S.C. § 11101(d) (codifying NRA § 8). Sections 2(c)–(e) and 9 are not codified, but are set out in notes following 49 U.S.C. § 10701.

2. The bankruptcy court gave defendants 12 months to pursue their counterclaims for repara-

enforcement of the judgments under F.R.Civ.P. 62(h).[3] In these orders, the district court adopted the recommended orders and memorandum opinions issued by the bankruptcy court on February 23 and 24, 1994. Defendants appeal, and we vacate the district court orders in each case and remand for further proceedings.

Bulldog's undercharge claims in each of the four proceedings now appealed are essentially identical, and such claims are not unique to this bankruptcy proceeding. In bankruptcy proceedings across the country, trustees have filed similar undercharge claims, based on the difference between a common carrier's tariff on file with the ICC and a lower, unfiled, negotiated rate. See *Reiter v. Cooper,* —— U.S. ——, —— – ——, 113 S.Ct. 1213, 1215–17, 122 L.Ed.2d 604 (1993). Estimates of the total value of undercharge actions arising out of the numerous motor carrier bankruptcies that followed industry deregulation range from $200 million to $32 billion. See H.R.Rep. No. 359, 103rd Cong., 1st Sess. 8, *reprinted in* 1993 U.S.C.C.A.N. 2534, 2535; see also *Reiter,* —— U.S. at —— – ——, 113 S.Ct. at 1215–17. We begin with a brief summary of the events producing this crisis, culminating in the passage of the Rates Act in 1993.

## I.

■■■ At the time of the shipments in question, the Interstate Commerce Act (ICA), 49 U.S.C. § 10101 *et seq.,* required that all motor common carriers file their shipping rates with the ICC. 49 U.S.C. § 10762(a)(1) (1991 pamphlet).[4] Under the ICA common carriers must charge, and shippers must pay, the applicable filed rate. 49 U.S.C. § 10762(a)(1). Congress intended the filed rate requirement to promote transportation rates that are both reasonable and nondiscriminatory. *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 119, 110 S.Ct. 2759, 2762, 111 L.Ed.2d 94 (1990). The Supreme Court has strictly applied the filing requirements of the ICA through the filed rate doctrine, which "embodies the principle that a shipper cannot avoid payment of the tariff rate by invoking common-law claims and defenses such as ignorance, estoppel, or prior agreement to a different rate." *Reiter,* —— U.S. at —— – ——, 113 S.Ct. at 1217–19.

In 1980, Congress passed the Motor Carrier Act (MCA), which partially deregulated the trucking industry by encouraging entry of new carriers into the industry, stimulating competitive pricing, and allowing carriers to operate under both common and contract authority. Pub.L. No. 96–296, 94 Stat. 793 (1980); see also *Maislin,* 497 U.S. at 133, 110 S.Ct. at 2769–70. In response to the MCA, the ICC promulgated regulations allowing common carriers to negotiate individual rates with shippers, a practice previously forbidden. See H.R.Rep. No. 359, *reprinted in* 1993 U.S.C.C.A.N. 2534, 2535. However, the MCA did not repeal the filed rate requirement, and, until 1994, carriers still had to file these individually negotiated rates with the ICC. 49 U.S.C. § 10762(a)(1) (1991 pamphlet). Carriers often failed to do this. See *Jones Truck Lines, Inc. v. Whittier Wood Products Co.,* 57 F.3d 642, 644 (8th Cir.1995).

The increased competition among carriers following passage of the MCA led to a rise in motor carrier bankruptcies. *ICC v. Trans-*

---

tions based on unreasonable rates before the ICC. See 49 U.S.C. § 11705(b)(3). These claims were still pending at the time of the district court orders.

**3.** The bankruptcy court modified the Rule 62(h) stay on July 26, 1994, requiring defendants to pay the amount of judgment on the undercharge claims into an escrow account, or provide supersedeas bond or letter of credit. This modification was approved by the district court.

**4.** Congress amended § 10762 with the Trucking Industry Regulatory Reform Act of 1994 (TIRRA). A provision was added to that section excluding from the filing requirement a motor common carrier transporting property, other than household goods, "under an individually determined rate, classification, rule, or practice...." 49 U.S.C. § 10762(a)(1) (1995 pamphlet). Interpreting the effect of this section of TIRRA, the ICC has stated that "[e]liminating the filed rate doctrine with respect to individually determined rates should significantly reduce the fear of potential undercharge disputes that has plagued the shipping public for almost a decade." *Policy Statement on the Trucking Industry Regulatory Reform Act of 1994,* 10 I.C.C.2d 251 (1994).

*con Lines,* —— U.S. ——, —— —— ——, 115 S.Ct. 689, 691–93, 130 L.Ed.2d 562 (1995). Trustees for bankrupt carriers began to pursue shippers that had paid discounted unfiled rates, claiming entitlement to the higher filed rate. *Reiter,* —— U.S. at —— —— ——, 113 S.Ct. at 1215–17. In response to the growing undercharge problem, the ICC declared in a policy statement it would consider on a case-by-case basis whether a carrier that attempts to collect retroactively a higher filed rate after having negotiated, billed, and collected a lower rate may be committing an "unreasonable practice" under 49 U.S.C. § 10701(a). See *NITL–Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 3 I.C.C.2d 99 (1986) (adopting Negotiated Rates policy); see also 5 I.C.C.2d 623 (1989) (clarifying ICC's policy toward negotiated rates).

The Supreme Court rejected the ICC's Negotiated Rates policy in *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The Court held that the ICC exceeded its authority in applying the unreasonable practice cause of action to undercharge claims, because the MCA had not repealed the filed rate doctrine, and therefore the ICC was not free to ignore the ICA's filed rate requirement. *Maislin,* 497 U.S. at 130, 135, 110 S.Ct. at 2768, 2770–71.

The Negotiated Rates Act, drafted in part as a response to the *Maislin* decision, see H.R. No. 103–359, was signed into law on December 3, 1993. Pub.L. No. 103–180, 107 Stat. 2044, 2053. The Rates Act does not completely repeal outright the filed rate requirement, see 49 U.S.C. § 10701(f)(7), but attempts to provide relief to shippers facing undercharge suits. Section 2, containing the remedial provisions of the Rates Act, creates three options for shippers. First, the Rates Act creates settlement options for shippers who negotiated and relied on an unfiled rate lower than the filed rate claimed by the trustee. 49 U.S.C. § 10701(f)(2)–(4). Depending on the transportation provided, ship-

pers can force the carrier to settle for from five to 20 percent of the value of the undercharge claim. 49 U.S.C. § 10701(f)(2)-(4). To take advantage of the settlement options, the shipper must show that the motor carrier is no longer transporting property. 49 U.S.C. § 10701(f)(1)(A).

The second option is a blanket exemption from undercharge liability for shippers that qualify as small-business concerns under the Small Business Act or charitable organizations under the Internal Revenue Code. 49 U.S.C. § 10701(f)(9)(A) & (B). Shipments of recyclable material are also exempt from undercharge claims. 49 U.S.C. § 10701(f)(9)(C). We decide today that this blanket exemption applies whatever the operating status of the motor carrier. See infra at III(A)(1).

The third option restores the unreasonable practice claim as overruled by the Supreme Court in *Maislin.* Rates Act § 2(e)(1) (not codified). However, the Rates Act restores this claim only for undercharges arising out of transportation services provided before September 30, 1990, which includes the shipments involved in these appeals.[5] Again, shippers can only assert this claim against carriers no longer transporting property. Rates Act § 2(e)(1).

■ Section 8 of the Rates Act provides that the ICC "shall have jurisdiction to, and shall, resolve" disputes over whether the shipments provided by a carrier were contract or common carriage. 49 U.S.C. § 11101(d). A contract carrier provides transportation services to shippers under a continuing agreement to provide motor vehicles for a shipper's exclusive use, or a continuing agreement designed to meet the distinct needs of a shipper. 49 U.S.C. § 10102(16)(B). Shipments transported by a carrier pursuant to its contract carrier authority are exempt from the filed rate requirement, see *Central & Southern Motor Freight Tariff Assoc., Inc. v. United States,*

---

5. The settlement provisions and the exemption from liability for small-business concerns, charitable organizations and recyclers apply to "claims pending as of the date of the enactment of this Act and to … claims arising from trans-

portation shipments tendered on or before the last day of the 24–month period beginning on such date of enactment." Rates Act § 2(c) (not codified).

757 F.2d 301 (D.C.Cir.) (upholding the ICC's blanket exemption from tariff-filing requirements for motor contract carriers), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985), and therefore carriers cannot claim undercharges for such shipments.

## II.

Bulldog filed a petition for reorganization under Chapter 11 of the bankruptcy code on December 11, 1990, which petition was converted to a liquidation under Chapter 7 on February 14, 1991. Bulldog's trustee, Langdon Cooper, retained Trans–Allied Audit Company, Inc. to examine Bulldog's freight bills to determine if the proper filed rates had been billed. The audit disclosed approximately $7 million in undercharges owed to Bulldog by various shippers. Defendants, who are certain brokers who transacted business with Bulldog prior to Bulldog's bankruptcy, refused to pay claimed undercharges. The Trustee filed adversary proceedings against defendants, seeking a total of $103,-883.49 in undercharges plus interest. The bankruptcy court entered its final recommended orders and memorandum opinions on February 23 and 24, 1994 and submitted them to the district court.

Adopting the bankruptcy court's determinations, the district court found that Bulldog Trucking was at all relevant times a motor common and contract carrier operating in interstate commerce pursuant to ICC authority. The district court further determined that Bulldog Trucking was no longer transporting goods for money and in fact was no longer operating in any capacity. The bankrupt estate was determined to owe approximately $16 million to various creditors and the assets of the estate consisted of approximately $9 million, $7 million of which were undercharge claims.

The district court decided that § 2 of the Rates Act does not apply to Bulldog's bankruptcy because § 2 violates the antiforfeiture provisions of the bankruptcy code. See 11 U.S.C. §§ 363(*l*), 541(c)(1). Next, the district court concluded that § 8 (49 U.S.C. § 11101(d)) of the Rates Act was unenforceable in bankruptcy because it conflicted with

the jurisdictional provisions of 28 U.S.C. §§ 157 and 1334. Because § 8 did not apply, the court concluded that it had discretion to determine the nature of the carriage for the shipments in question. The district court then decided that the shipments at issue in each case were common carriage. The court granted summary judgment on the undercharge claims and decided that Rule 54(b) certification of those judgments was appropriate.

## III.

On appeal, defendants first argue that the district court erred in refusing to apply Rates Act §§ 2 and 8 to adversary proceedings brought on behalf of a bankrupt motor carrier. If this court determines that the Rates Act applies to the proceedings in this case, defendants request that we vacate the district court's orders and remand with instructions to stay the bankruptcy proceedings to allow defendants to seek relief before the ICC. We do not reach defendants' remaining assignments of error because we are of opinion that the Rates Act applies to the proceedings in these cases.

We review the district court's statutory interpretations and grant of summary judgment *de novo. In re JKJ Chevrolet, Inc.,* 26 F.3d 481 (4th Cir.1994); *Moss v. Parks Corp.,* 985 F.2d 736 (4th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2999, 125 L.Ed.2d 693 (1993). When construing a statute, we must first look to the statutory language. *In re JKJ Chevrolet,* 26 F.3d at 483. If the language of the statute is unambiguous and there is no clear Congressional intent to the contrary, the language is conclusive. *In re JKJ Chevrolet,* 26 F.3d at 483. In a case such as this, when we must construe two statutory schemes together, our duty is to reconcile and harmonize the statutes, and carry out the legislative intent behind both schemes. *Pittsburgh & Lake Erie R.R. Co. v. Railway Labor Executives' Assoc.,* 491 U.S. 490, 510, 109 S.Ct. 2584, 2596–97, 105 L.Ed.2d 415 (1989).

Applying these principles, we turn now to defendants' principal assignment of error, that the district court erred in concluding

that certain provisions of the Rates Act do not apply to these bankruptcy proceedings. First, we consider defendants' argument that the district court erred in holding that § 2 does not apply to Bulldog's bankrupt estate because that section violates the antiforfeiture provisions of the bankruptcy code. Second, we address defendants' contention that the district court erred in determining that § 8 of the Rates Act (49 U.S.C. § 11101(d)) does not apply to proceedings in bankruptcy, by virtue of 28 U.S.C. §§ 157 and 1334 and Rates Act § 9 (not codified).

## A.

■ Section 2 contains procedures for resolving undercharge claims, including provisions setting out the settlement options, the small business exemption, and the unreasonable practice provisions. See Rates Act § 2(a), (e). The district court concluded that application of § 2 in a bankruptcy proceeding would violate the antiforfeiture provisions of the bankruptcy code, 11 U.S.C. §§ 363($l$) and 541(c)(1).[6]

Section 541(c)(1)[7] makes inoperative against the formation of the property of a bankrupt estate any law that is (1) applicable nonbankruptcy law, (2) conditioned on the financial condition of the debtor, and that (3) gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property. 11 U.S.C. § 541(c)(1). We need not decide whether § 2 is applicable nonbankruptcy law, or whether it effects a forfeiture, modification, or termination of a carrier's property, because we are of opinion that § 2 is not conditioned on the financial condition of the bankrupt carrier.[8]

We will address § 2 in two parts. First, we will examine the exemption from undercharge liability for small businesses, charitable organizations, and shippers of recyclable material, codified at 49 U.S.C. § 10701(f)(9), to determine if the exemption applies to all carriers or only those no longer transporting property. Since the exemption's application turns on the status of the shipper or the shipment, none of which is related to the financial condition of the carrier, the exemption does not violate the antiforfeiture provisions.[9] We will then examine the remainder of § 2, specifically the settlement options and the unreasonable practice defense, which apply only to nonoperating carriers, in light of the bankruptcy code's antiforfeiture provisions.

### 1.

■ Paragraph 9 of § 10701(f), added by the Rates Act, provides that shippers qualifying as small business concerns under 15 U.S.C. §§ 631 *et seq.* shall not be liable for undercharge claims. The district court held that paragraph 9 applies only to claims by carriers no longer transporting property. We disagree. Paragraph 9 is:

(9) CLAIMS INVOLVING SMALL–BUSINESS CONCERNS, CHARITABLE ORGANIZATIONS, AND RECYCLABLE MATERIALS.—Notwith-

---

**6.** The district court's orders state that § 2 of the Rates Act does not apply to Bulldog's bankrupt estate. However, the adopted memorandum opinions state only that § 2(a)–(c) and (e)–(g) do not apply to Bulldog's bankruptcy. Section 2(d) (not codified) requires that the ICC report to Congress whether justification exists for extending application of § 2(a) and (b) (49 U.S.C. § 10701(e)–(f)) beyond December 3, 1995.

**7.** Section 541(c)(1) is, in pertinent part:
Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law—
(A) that restricts or conditions transfer of such interest by the debtor; or

(B) that is conditioned on the insolvency or financial condition of the debtor; on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

**8.** The trustee does not argue, and the record does not reflect, that any portion of § 2 is conditioned on the insolvency of a carrier, on the commencement of a case in bankruptcy, or on the appointment of or the taking possession by a trustee before the commencement of a bankruptcy case. See 11 U.S.C. §§ 363(1), 541(c)(1).

**9.** See footnote 8 supra.

standing paragraphs (2), (3), and (4), a person from whom the additional legally applicable and effective tariff rate or charges are sought shall not be liable for the difference between the carrier's applicable and effective tariff rate and the rate originally billed and paid-

> (A) if such person qualifies as a small-business concern under the Small Business Act (15 U.S.C. 631 et seq.),
>
> (B) if such person is an organization which is described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code, or
>
> (C) if the cargo involved in the claim is recyclable materials, as defined in section 10733.

49 U.S.C. § 10701(f)(9). This paragraph allows certain shippers to bypass the settlement provisions and avoid liability. Examining § 2 in its entirety, we are of opinion that the requirements of 49 U.S.C. § 10701(f)(1)(A) do not apply to shippers seeking to defeat claims under paragraph 9. Section 10701(f)(1) reads in part:

> .... the person against whom the claim is made may elect to satisfy the claim *under the provisions of paragraph (2), (3), or (4)* of this subsection, upon showing that-
>
> (A) the carrier or freight forwarder is no longer transporting property or is transporting property for the purpose of avoiding application of this subsection....

49 U.S.C. § 10701(f)(1) (emphasis added). Paragraphs 2, 3, and 4 contain the settlement options. 49 U.S.C. § 10701(f)(2)-(4). This section does not list paragraph 9 as one of the paragraphs limited in application to non-operating carriers.

The trustee argues, however, that because paragraph 9 states that it applies "notwithstanding paragraphs (2), (3), and (4)," a shipper must qualify for relief under the settlement provisions before it is eligible for relief from liability under paragraph 9. We find this argument to be unpersuasive.

First, if Congress intended to condition application of § 10701(f)(9) on the operating status of the carrier it could have done so clearly by listing paragraph 9 along with paragraphs 2 through 4 in § 10701(f)(1)(A). See *Jones Truck Lines, Inc. v. Whittier Wood Products Co.,* 57 F.3d 642, 648 (8th Cir.1995).

The trustee further contends that his interpretation gives meaning to the "notwithstanding paragraphs (2), (3) and (4)" language in paragraph 9. However, his is not the only interpretation. We are of opinion that Congress included this language to clarify that relief under paragraph 9 is available to shippers facing undercharge claims by nonoperating carriers; such shippers are not limited to the settlement options in paragraphs (2), (3) or (4).

Because we conclude that paragraph 9 applies to undercharge claims, regardless of the financial condition of the carrier, its application to Bulldog's bankrupt estate does not violate § 541(c)(1).[10]

#### 2.

■ We next turn to the applicability in bankruptcy of the settlement options and the unreasonable practice cause of action. The settlement options of subsection 2(a), codified at § 10701(f)(2)–(4), and the unreasonable practice claim in subsection 2(e), not codified, apply only to undercharge claims brought by carriers no longer transporting property. 49 U.S.C. § 10701(f)(1)(a); Rates Act § 2(e)(1). The district court concluded that this restriction is based on Bulldog's financial condition. We disagree. A carrier may be financially troubled and continue to operate outside of bankruptcy; and a carrier that files a petition for bankruptcy under Chapter 11, and even Chapter 7 in limited circumstances, can still operate. See 11 U.S.C. §§ 721, 1108. The settlement options and the unreasonable practice defense are not available to shippers facing undercharge claims brought by such carriers. See, e.g., *Gross Common Carrier, Inc. v. A.B. Dick Co.,* 861 F.Supp. 638, 641 (N.D.Ill.1993). On the other hand, a financially stable carrier may cease to operate for any reason at all and be subject to those provisions.

---

**10.** See footnote 8 supra.

The trustee argues that Congress' use of the restriction "no longer transporting property" is merely a means to avoid the constraints of § 541(c)(1) without amending the bankruptcy code. We cannot agree. That many nonoperating carriers seeking undercharges are in bankruptcy does not render the distinction Congress chose, between operating and non-operating carriers, meaningless.

A nonoperating carrier, for example, whether or not in bankruptcy, has no need for goodwill from shippers and thus has nothing to lose by pursuing undercharge claims against former customers. See, e.g., *Gumport v. Sterling Press*, 58 F.3d 1432 (9th Cir. 1995) (discussing one motor carrier that "divested its operations yet continued to procure a healthy stream of income by collecting on the numerous undercharge claims it possessed"). In contrast, a carrier still in operation has an incentive not to pursue undercharge claims against shippers that may wish to transport with that carrier in the future.

Also, the filed rate doctrine is meant to prevent discriminatory pricing and to promote reasonable rates. *Maislin*, 497 U.S. at 116, 110 S.Ct. at 2760–61. By limiting the applicability of certain provisions of the Rates Act to claims of carriers no longer transporting property, Congress has determined that those concerns no longer apply to nonoperating carriers and therefore there is no need strictly to apply the filed rate requirement to such carriers.

The trustee further argues that because 11 U.S.C. § 541(c)(1) applies to laws conditioned on insolvency or financial condition, financial condition must mean something more than insolvency. We agree that under the plain language of the statute, financial condition must mean something more than insolvency

in the bankruptcy sense.[11] However, the district court defined "financial condition" to be any information reflected on a company's financial statements, and we decline to adopt such a standard. Whatever financial condition may include, it is not so broad as to include a motor carrier's operating condition, see *Gumport v. Sterling Press*, 58 F.3d 1432 (9th Cir. 1995), and we therefore conclude that no part of § 2 of the Rates Act violates § 541(c)(1). For the same reasons, we are of opinion that no part of § 2 violates 11 U.S.C. § 363(*l*).[12]

Because we conclude that § 2 applies to Bulldog's bankrupt estate, these cases must be remanded to allow defendants to claim exemption from undercharge liability under 49 U.S.C. § 10701(f)(9), to assert an unreasonable practice claim, Rates Act § 2(e), or to opt to settle under 49 U.S.C. § 10701(f)(2)–(4). As applicable, should defendants choose to assert an unreasonable practice claim or choose to settle, the district court should refer appropriate issues to the ICC as required by the Rates Act. See 49 U.S.C. § 10701(f)(1)–(4); Rates Act § 2(e).

We note that our conclusion that § 2 does not violate the antiforfeiture provisions of the bankruptcy code conforms with the opinion of the two other circuits that have addressed this issue. In *Whittier Wood Products*, the Eighth Circuit held that the Rates Act exempts small businesses, charitable organizations, and recyclers from undercharge claims. 57 F.3d at 648–49. The Eighth Circuit further noted that the Rates Act applies in bankruptcy despite 11 U.S.C. §§ 363(*l*) and 541(c)(1). 57 F.3d at 649. In *Gumport v. Sterling Press*, 58 F.3d 1432 (9th Cir. 1995), the Ninth Circuit held that "no longer transporting property" is not a financial condition under 11 U.S.C. §§ 363(*l*) and 541(c)(1).

---

**11.** 11 U.S.C. § 101(32)(A) defines insolvent, in the context of a corporation, to be a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation...."

**12.** 11 U.S.C. § 363(*l*) reads:
   Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property,

notwithstanding any provision in a contract, a lease, or applicable law that is *conditioned on the insolvency or financial condition* of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.
(emphasis added).

*Sterling Press,* 58 F.3d at 1440. The Ninth Circuit expressly declined to address whether 49 U.S.C. § 10701(f)(9) applies to carriers still transporting property. *Sterling Press,* 58 F.3d at 1435.

### B.

██ Defendants next argue that the district court erroneously concluded that Rates Act § 9 renders § 8 unenforceable in bankruptcy. Section 8 adds subsection (d) to 49 U.S.C. § 11101, which reads:

> (d) RESOLUTION OF DISPUTES RELATING TO CONTRACT OR COMMON CARRIER CAPACITIES.—If a motor carrier (other than a motor carrier providing transportation of household goods) subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title has authority to provide transportation as both a motor common carrier and a motor contract carrier and a dispute arises as to whether certain transportation is provided in its common carrier or contract carrier capacity and the parties are not able to resolve the dispute consensually, the Commission shall have jurisdiction to, and shall, resolve the dispute.

Section 9, not codified, reads:

> Nothing in this Act (including any amendment made by this Act) shall be construed as limiting or otherwise affecting application of title 11, United States Code, relating to bankruptcy, title 28, United States Code, relating to the jurisdiction of courts of the United States (including bankruptcy courts); or the Employee Retirement Income Security Act of 1974.

The district court held that applying § 8 in bankruptcy would divest the bankruptcy and district courts of their jurisdiction under 28 U.S.C. §§ 157 and 1334.[13] The court concluded that § 9 prohibits this result, because it states that nothing in the Rates Act is meant to limit or otherwise affect application of title 28. The adopted memorandum opinions state that "[s]ection 8 does not confer original and exclusive jurisdiction on the ICC to hear and resolve contract carriage disputes." We agree.

██ However, the district court also held that § 8 cannot create presumptive primary jurisdiction in the ICC without violating § 9. Here, we disagree. Primary jurisdiction applies to claims "properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter,* ——— U.S. at ——— ———, 113 S.Ct. at 1219–21.

██ We think the plain language of § 8 demonstrates that Congress intended that the ICC should decide initially the type of carriage involved in a given dispute, subject to later review by the courts.[14] The bankruptcy court mistakenly believed that giving the ICC primary jurisdiction over this issue deprives bankruptcy courts of their original jurisdiction under title 28. In *Reiter v. Cooper* the Supreme Court, discussing the doctrine of primary jurisdiction, stated that "[r]eferral of the issue to the administrative agency *does not deprive the court of jurisdiction.* It has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." —— U.S. at ——— – ———, 113 S.Ct. at 1219–21 (emphasis added). Reading § 8 to give the ICC primary jurisdiction initially to determine the nature of carriage

---

**13.** 28 U.S.C. § 1334(b) reads:

> (b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 157(a) states:

> (a) Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or

related to a case under title 11 shall be referred to the bankruptcy judges for the district.

**14.** 28 U.S.C. § 1336(b) reads in full:

> (b) When a district court . . . refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral.

gives effect to Congress' intent to have the ICC decide the issue of contract or common carriage, an area clearly within its special expertise. See *Transrisk Corp. v. Matsushita Electric Corp.*, 15 F.3d 313, 318 (4th Cir. 1994). At the same time, the bankruptcy court retains original jurisdiction, as required by § 9.

Because the district court erred in refusing defendants' request for a stay and referral of this issue to the ICC, we vacate the district court's determination that all shipments at issue in these proceedings were common carriage, and remand so that the proceedings may be stayed and this dispute over the nature of carriage be referred to the ICC for initial determination. We note that because there is no statute setting out the procedure in allowing a court to refer a matter to the ICC, the proper procedure is for the court to stay or dismiss the proceedings, while allowing defendants to file a petition for relief before the ICC. See *Reiter*, —— U.S. at —— n. 3, 113 S.Ct. at 1220 n. 3.

### IV.

On remand, defendants should be allowed to amend their pleadings and assert any defenses or options provided to them under the Rates Act. Defendants may assert that they are entitled to relief under § 10701(f)(9) if they qualify as small-business concerns. If defendants choose not to claim relief under that paragraph, or if the district court determines that any defendant does not qualify for relief as a small-business concern, the district court should stay the proceedings and allow defendants to complete the presentation of their claims of contract carriage, unreasonable rates, and unreasonable practices to the ICC.

*VACATED AND REMANDED.*